UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** )<br>)<br>)<br>**v.** )<br>)<br>**NATHAN EARL HUGHES** )<br>)<br>)<br>**Defendant** )<br>) | Case No. 23-cr-237 CJN |

**DEFENDANT NATHAN HUGHES' MOTION TO SUPPRESS**

William L. Shipley, Jr., Esq.
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*

I.  INTRODUCTION:

Defendant Nathan Hughes, by and through his undersigned counsel of record, William L. Shipley, hereby moves this Court for an order suppressing all evidence obtained by the Government during a search of his residence on August 30, 2023.

Defendant Hughes further moves this Court to suppress all evidence subsequently obtained by the Government that is traceable to information or evidence taken during the unlawful search of his residence on August 30, 2023

The basis of this motion is that the Government lacked probable cause on August 30, 2023, to search for evidence related to the alleged criminal conduct of Defendant Hughes on January 6, 2021. More than 950 days passed between the alleged criminal conduct and the date of the application to search for evidence related to that alleged criminal conduct.

That passage of time rendered the information set forth in the Affidavit "stale" and therefore not a reasonable basis upon which to conclude the items subject to seizure would be found at the location to be searched, thereby rendering the resulting search "unreasonable" under the Fourth Amendment.

II.  FACTS AS ALLEGED IN AFFIDAVIT

The Affidavit in support of the Application for a Search Warrant is attached to this motion, marked as Exhibit "A". The relevant factual information justifying the search is as follows:

Par. 36: Based on a review of public records, on August 24, 2023, Defendant Hughes lived at the location to be searched.

Par. 42:  Flight records show Defendant Hughes flew from Arkansas to Washington, D.C., on January 4, 2021.

Par. 46:  Open-source video shows Defendant Hughes at the "Stop The Steal" Rally at the Ellipse on January 6, 2021.

Par. 47:  The attire worn by Defendant Hughes on January 6, 2021, is described.

Par. 49:  Between the Rally and 2:33 pm, Defendant Hughes changed some outer garments based on video taken at the Capitol.  That other clothing is described.

Par. 50:  At 2:33 pm, Defendant Hughes is alleged to have been seen riding a golf cart on the Capitol grounds.

Par. 53:  Beginning at approximately 3:15 and continuing thereafter, Defendant Hughes is shown on video to be in and around the Lower West Tunnel entrance and alleged to have been participating with others in efforts being opposed by law enforcement officers inside the Tunnel.

Par. 63:  On January 8, 2021, the FBI received at least two tips that Defendant Hughes had traveled to Washington DC on January 6, 2021, and was at the Capitol.  One such tip included a link to Defendant Hughes' social media.

Par. 64:  In August 2021 – 8 months later – open-source searches of Defendant Hughes' "Twitter" account produced evidence of his presence at the Capitol on January 6, 2021.

Par. 66-67:  An image of Defendant Hughes taken from video of the events on January 6 was matched to a known photograph of Defendant

Hughes from Arkansas state records, as well as surveillance of Defendant Hughes by law enforcement.

Par. 71-77:  These paragraphs contain standard or "boilerplate" observations of the Affiant based on "training and experience" about the manner in which subjects under criminal investigation conduct themselves and the types of evidence they typically retain that is relevant to their criminal activity.  While some of this information makes reference to January 6, 2021, none of it makes any reference to Defendant Hughes, other than observations made without foundation by the Affiant that some of clothing worn by Defendant Hughes potentially had sentimental value to him making it more likely that he would have retained possession of that clothing for more than 950 days.

Paragraph 75 makes the following noteworthy claim:

"[I]t is well known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone."

Par. 78-80:  The Affiant describes searches in other January 6 investigations that resulted in the seizure of evidence related to the allegations of criminal conduct by the individuals who were the subject of those search warrants.  The dates of the referenced searches, in the order they appear in the Affidavit, were:

Mid-February 2022 – District of Massachusetts

Early March 2022 – Eastern District of New York

Early April 2022 – Middle District of Alabama

Late May 2022 – Southern District of Texas

Early June 2022 – Eastern District of Virginia

June 29, 2022 – District of Rhode Island

September 30, 2022 – Western District of Pennsylvania

October 12, 2022 – Western District of Washington

October 26, 2022 – Burke, Virginia

January 13, 2023 -- Eastern District of Virginia

February 1, 2023 – Eastern District of Michigan

April 11, 2023 – Western District of Texas

April 12, 2023 – District of New Mexico

April 27, 2023 – Middle District of Pennsylvania

June 7, 2023 – Eastern District of New York

  Par. 82:  The Affiant makes the following factual claim – "The property to be searched includes a laptop computer, mobile phones, and/or table computers owned, used, or controlled by Nathan Earl Hughes."

  On January 8, 2021, the government received its first "tip" that Defendant Hughes had attended the protest at the Capitol.  The FBI interviewed Defendant Hughes on January 26, 2021, and he admitted to having been at the protest at the Capitol.

  Because no evidence setting forth probable cause is referenced after May 2022 to support a claim that probable cause to search the supposed residence of Defendant Hughes on August 30, 2023, and all the information set forth in the Affidavit to establish "probable cause" was stale.  Therefore, the search was

unreasonable and violated Defendant Hughes' rights under the Fourth Amendment.

Further, the warrant was overbroad with regard to the nature of items that were allowed to be seized, with not limiting instructions included with regard to isolating and separating items that belonged to Mr. Hughes from items that belonged to other occupants of the house, including Mr. Hughes' girlfriend.  For all practical purposes, the language of the warrant authorized a generalized search of the property for any items of interest to law enforcement.

    III    <u>Law and Argument</u>

A.    The Search Should be Suppressed on the Basis that the Probable Cause Set Forth was Based on Factual Information that was Stale; the Warrant Authorized an Overbroad and Unlawful General Search; and the Probable Cause Conclusion Drawn By the Affiant Was Based In Part on Boilerplate Language and the Results of Searches of Locations Unrelated Defendant Hughes or this Case.

        1.    Defendant Hughes Had An Expectation of Privacy In The <u>Location Searched on August 30, 2023</u>.

It is axiomatic that the Fourth Amendment prohibits "unreasonable" searches and seizures of property where an individual possesses a reasonable expectation of privacy.  To be deemed "reasonable," any search of a residence requires that law enforcement obtain a valid warrant before undertaking such a search. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

In Paragraph 36 the Affiant claims that Defendant Hughes resided at the target location.  On that basis, the Government cannot contest that Defendant had a reasonable expectation of privacy in that location as his residence, and a

warrant based on sufficient and valid probable cause was required to conduct a lawful search for evidence.

        2.        <u>The Search Warrant Lacked Probable Cause</u>.

The Supreme Court has "recognize[s] that the Fourth Amendment was the Founding Father's response to the 'general warrants' and 'writs of assistance' of the colonial era, which British officers employed to rummage through homes in an unrestrained search for evidence of criminal activity." Riley, 134 S. Ct. at 2494; see also *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)("General warrants of course, are prohibited by the Fourth Amendment. 'The problem … is not that of intrusion per se, but of a general exploratory rummaging in a person's belongings.' ")(internally quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

The Supreme Court has declined to reduce the "probable cause" standard "to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Nonetheless, long-established legal principles make clear that certain things cannot make up a showing of "probable cause."

Probable cause that a person may have been involved in a crime cannot alone justify a search of that person's residence. There must be additional evidence linking the person's home to the suspected criminal activity or that specific evidence of that criminal activity is likely to be found in the home. *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998); see also *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995). In other words, the Fourth Amendment does not authorize opportunistic searches of residences merely because an occupant is suspected of having violated a law.

      a.      The Probable Cause In The Affidavit Was Based on <u>Supporting Evidence That Was Impermissibly Stale</u>.

In this Circuit, the Court of Appeals has emphasized that:

> "[T]he facts supporting a warrant must be `so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *United States v. Webb*, 255 F.3d 890, 904 (D.C. Cir. 2001) (quoting *Sgro v. United States*, 287 U.S. 206, 210, 53 S.Ct. 138, 77 L.Ed. 260 (1932)). "[A]lthough the time between the application for a warrant and the discovery of the evidence supporting that application is `not controlling,' it is nonetheless important." *Id.* (quoting *Schoeneman v. United States*, 317 F.2d 173, 177 (D.C. Cir. 1963))."

*United States v. Jenkins*, 984 F.3d 1038, 1044 (D.C. Cir. 2021).

Courts in this Circuit have sometimes been more "lenient" in evaluating claims of staleness in extended conspiracies or ongoing criminal activity, as compared to single-incident crimes or observations about the presence of relevant evidence in a particular location.  <u>United States v. Washington</u>, 775 F.3d 405, 409 (D.C.Cir. 2014).

As noted with respect to the factual allegations of the Affidavit – and is apparent from an examination of information that is not set forth – the Affiant offered no justification or for why more than 950 days elapsed between the time it was aware of evidence that Defendant Hughes had attended the rally and protest at the Capitol on January 6, and when it took used that evidence as justification to seek a search warrant from an Arkansas Magistrate. Paragraphs 42 and 46 allege information placing Hughes at the Rally and the Capitol on January 6, 2021.  Paragraph 63 states that at least two tips were received by January 8, 2021, stating that Defendant Hughes was at the Capitol, and directing law enforcement to social media accounts allegedly

belonging to Defendant Hughes.  Defendant Hughes admitted in an interview on January 21, 2021, that he was at the Capitol.

Yet the Affidavit is void of any evidence remotely close in time to August 30, 2023, that would have served to "freshen" up the conclusion that probable cause existed at that date to believe that Defendant Hughes still had possession in his residence of items that might link him to the events of January 6, 2021 – 950+ days earlier.

The lack of any temporal connection between the alleged criminal activity and the request to search for relevant evidence at a particular location was the basis upon which Senior Judge Lamberth suppressed evidence obtained with stale probable cause in *United States v. Lindsey*, 596 F.Supp. 2d 55, 58-59 (D.D.C. 2005):

> The D.C. Circuit visited the question of staleness in *United States v. Webb,* 347 U.S. App. D.C. 162, 255 F.3d 890 (D.C. Cir. 2001). In that case … the warrant did not issue until 109 days later. Although the D.C. Circuit eventually affirmed the trial court's denial of the motion to suppress on *Leon* good faith grounds, it engaged in a discussion of "staleness." The Circuit stated that it found the "issuance of this warrant troubling." *Id*. It also approvingly cited a previous case in which the Circuit found no probable cause to issue a search warrant when documents were last seen in a residence 107 days before the search warrant was issued. Id….
>
> On the basis of that law, the warrant here did not issue upon probable cause. Even if the Court reads the affidavit as if the photographs that gave rise to the warrant were taken on August 9, 2007, the search warrant was not issued until approximately 178 days after this date. Not only is this much longer than the 109 days in *Webb*, but this case involves a "single-incident crime," which the Circuit has suggested it will not be lenient about with regard to staleness.
>
> Because the photographs were the only evidence of criminal activity that was linked to the defendant or his residence, and those photographs were stale, the warrant did not issue upon probable cause in this case."

There was no allegation that Defendant Hughes was engaged in an ongoing conspiracy or continuing course of criminal conduct following the events of January 6, 2021. The events at the Capitol were a "single incident crime," and under the controlling authority in this Circuit, the time span between obtaining the evidence supporting probable cause and seeking a search warrant based on that evidence is an important factor in finding probable cause to be stale, and the search warrant issued on the basis of that stale evidence unreasonable under the Fourth Amendment.

      b.      The Affidavit Lacked Any Evidence That the Devices To Be Seized Were Devices Possessed by Defendant Hughes on January 6, 2021.

The warrant broadly authorizes the seizure of any computers and cellular telephones found at the premises. What the Affidavit lacks is any evidence that Hughes owned or possessed a phone on January 6, 2021, and that he was likely to still have possession of that same phone as of August 30, 2023. The Affidavit also lacks any factual basis to conclude that Hughes had a computer inside the residence -- or that any computer inside the residence had any connection to his alleged actions on January 6, 2021. In fact, as the Government now knows, one of the computers taken was relatively new and belonged to his girlfriend – it had no connection to the events of January 6 at all. There was no basis in the Affidavit to seize devices that did not belong to Defendant Hughes, and the fact that the searching officers felt authorized to do so supports the conclusion this was read by them as a "general warrant."

Paragraph 40 refers to "phone records obtained in connection with the investigation" and that "Individual 1" was in telephone communication with

Defendant Hughes 46 times between January 4 and 7, 2021. But the Affidavit doesn't identify what records those were or what phone they relate to. The Affidavit does establish that the Government did know the number for Defendant Hughes' cell phone. That raises the question as to why no information was included in the Affidavit to identify that phone, whether it remained in use in August 2023, or if Defendant Hughes was even using the same cellular service provider in August 2023 that he used in January 2021.

Indeed, the Affidavit does not contain allegations to support the conclusion made by the Affiant that in late August 2023 any particular evidence relating to the alleged criminal activity 950 days earlier would likely be found at the location to be searched.

In United States v. Rowland, the Tenth Circuit rejected a similarly deficient warrant. There, police had evidence that child pornography would be delivered to an individual's post office box. The court ruled that that evidence did not establish probable cause for the search of the individual's home for additional contraband because "[p]robable cause undoubtedly requires a nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched." 145 F.3d at 1203.

      c.     That Relevant Evidence Was Found In Other Untimely Searches Was Not A Basis For Finding that Fresh Probable Cause Justified The Search in August 2023.

The most curious portion of the Affidavit is that found at paragraphs 78 to 80 where the Affiant provides a list of searches in other cases connected to January 6 during which evidence apparently relevant to those cases was found.

The first listed case involved a search in January 2022, and the last listed case involved a search in April 2023.

The Affidavit doesn't reference whether any of those searches were challenged on the basis that the probable cause set forth in the affidavit was stale.

Nor does the Affidavit offer any information about whether – and how many – searches have been conducted during that same time frame where no relevant evidence was discovered. Such fruitless searches would support the countervailing conclusion that too much time had passed since the events of January 6, 2021, to conclude there was probable cause to believe that evidence related to the alleged crimes on that day would still be found at the locations to be searched.

That is why the staleness doctrine exists and is enforced – the passage of time generally reduces the likelihood that relevant evidence will still be found at the location to be searched.

For all practical and legal purposes, the fact that evidence in unrelated cases involving unrelated suspects at unrelated locations have absolutely no relevance to forming a conclusion that probable cause existed to believe evidence related to the events of January 6, 2021, would be found inside the target location on August 30, 2023.

        3.    The Good-Faith Exception of *United States v. Leon* Does Not Apply.

The government is generally barred from introducing evidence in its case-in-chief that was obtained through a Fourth Amendment violation. See *Weeks*

*v. United States,* 232 U.S. 383 (1914), and *Mapp v. Ohio,* 367 U.S. 643 (1961). The exclusionary rule is meant to enforce Fourth Amendment rights primarily by deterring Government violations with an evidentiary sanction. *United States v. Calandra,* 414 U.S. 338, 348 (1974).

In *United States v. Leon,* 468 U.S. 897 (1984), the Supreme Court announced the "good-faith exception" to the exclusionary rule. Where an officer executes a search warrant in reasonable, good-faith reliance on the warrant's validity, but a court later determines that the warrant was invalid, the exclusionary rule will not apply. *Id.* at 922-26. If, however, an officer's reliance on a warrant's validity is objectively unreasonable - such as where a warrant is "based on an 'affidavit so lacking in indicia of probable cause'" or "so facially deficient" that the executing officers cannot reasonably presume it to be valid - then the exclusionary rule will still apply. *Id.* at 923.

In *United States v. Lindsey,* Senior Judge Lamberth rejected application of *Leon* to the facts that involved a delay of 178 days between the date of the evidence supporting probable cause that the date of the application for the search warrant. He did so primarily based on the experience of the Affiant.

> The final issue that must be addressed is whether *Leon* does not apply because the search warrant that was issued in this case was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon,* 468 U.S. at 923. A mistake is obvious if "a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances." *Herring v. United States,* 129 S. Ct. 695, 703, 172 L. Ed. 2d 496 (2009)(citing *Leon,* 468 U.S. at 922, n.23)....
>
> [A]gent Sparks, the affiant, has extensive law enforcement knowledge and experience, which is a factor to be taken into account when determining whether an officer would know if a search was illegal despite the magistrate's authorization....

> The totality of the circumstances lead the Court to conclude that the warrant was so lacking in the indicia of probable cause that an objectively reasonable officer should not have relied on it. The critical evidence used in support of the search warrant was gathered approximately two years before the search, the affidavit did not include the date when the critical evidence was gathered, the affidavit purported to support a search for a gun -- a portable object -- long after the gun was observed in the photograph, and the defendant was never actually observed with the gun. The *Leon* good-faith exception is inapplicable in this case.

The Affiant on the Search Warrant Application and Affidavit in this case was FBI Special Agent Kimberly Rae Allen. In Paragraph 2 of the Affidavit she stated that she had been a Special Agent for 4 years. She stated that she has previously been the Affiant on search warrants for premises and electronic devices, including other cases dealing with the events of January 6, 2021. In addition to relying on information from other Agents, she stated that the contents in the Affidavit are based on her training and experience.

The facial deficiencies of the affidavit are so obvious that an objectively reasonable law enforcement officer could not have read its contents to support a finding of probable cause to search on August 30, 2023. Lacking sufficient probable cause to satisfy the Fourth Amendment, reliance on the Magistrate's error in signing the Application and Warrant was unjustified and the resulting search was unreasonable.

IV.     CONCLUSION

It has been clear for more than 80 years that mere suspicion that someone is involved in criminal activity does not constitute probable cause to search that person's residence. See, e.g., *Nathanson,* 290 U.S. at 47 and *Gates,*

462 U.S. at 239. This is not a question of deference to the good-faith of non-lawyer police officers. It is a clear-cut case of a warrant that is invalid on its face.

The probable cause in the warrant was based on obviously stale information. The warrant was patently overbroad. Hughes' proper address and place he resided were listed, but the warrant authorized the search of all electronics in the location without regard to who they belonged to – or whether Hughes even had the same phone he was using on January 6, 2021. The affidavit made no mention of the number or identities of the occupants of the house, and the warrant made no distinction between them with regard to what evidence could be seized within the scope of the Warrant.

An objectively reasonable officer reviewing the warrant would recognize that such a warrant, unsupported by facts or tailored in scope to the information sought, should never have been issued. Even without legal expertise, an officer should recognize the warrant did nothing more than authorize a general rummaging in search of evidence of criminal activity, and therefore the good faith exception to the exclusionary rule does not apply.

The government waited 950 days after January 6, 2021, before it applied for a warrant to search Hughes' residence for evidence. The time for lawful searches based merely on the events of that day has long since passed. This Court must suppress all evidence seized as a result of that search, and any evidence the Government intends to use at trial that might be traced to the fruits of that unlawful search.

Dated: March 22, 2024					Respectfully Submitted,

						/s/ William L. Shipley
						William L. Shipley, Jr., Esq.
						PO BOX 745
						Kailua, Hawaii 96734
						Tel: (808) 228-1341
						Email: 808Shipleylaw@gmail.com

						*Attorney for Defendant*