**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No: 23-CR-237 (CJN) |
| | : | |
| NATHAN EARL HUGHES, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANTS' MOTION TO SUPPRESS EVIDENCE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion to Suppress. ECF 115. The defendant seeks to have the clothing items and digital devices seized during the August 30, 2023, search of his residence suppressed on the grounds that the search warrant 1) lacked probable cause due to staleness, and 2) lacked evidence that the devices to be searched were the specific devices possessed by the defendant on January 6, 2021. For the reasons set forth below, the defendant's motion should be denied.

I.    **Facts And Procedural History**

    A.    Facts

        1.    *Defendant's Conduct Before, On, and After January 6, 2021*

The government has set forth the detailed facts of this case, *see* ECF 56-1, and additionally relies on the facts as set forth in the search warrant affidavit, *see* Attachment A. The government incorporates these facts by reference. However, the government will briefly set forth the facts as relevant to this motion.

Prior to traveling to Washington, the defendant was active on social media and used digital devices in connection with the events that would be taking place in Washington on January 6, 2021. On or about December 29, 2020, the defendant responded to a tweet referencing events

1

scheduled to take place on January 6, 2021. The defendant specifically responded to a tweet soliciting "good backup ideas for when a central comms blackout happens in continental US." The defendant, using his Twitter handle (@RallyNate), posted a link to two-way radios available for purchase on Amazon. Between October 29, 2020, and December 28, 2020, the defendant also spent several thousand dollars at sporting goods stores, gun stores, and tactical gear outlets.

On January 4, 2021, the defendant traveled to Washington, D.C., from his home in Bentonville, Arkansas. While he was *en route* to D.C., the defendant replied to a tweet from Individual-1, a known person who was involved with organizing some of the events in Washington on January 6. The tweet from Individual-1 indicated that his purpose in Washington was to "fight fir [*sic*] our Republic!" The defendant's response to this tweet was "See you soon brother!" Phone records indicate that the defendant was in contact with Individual-1 more than forty times between January 4 and January 7, 2021.

Also on January 4, 2021, after he arrived in Washington, D.C., the defendant was referenced in a tweet from Individual-1. The tweet included a photograph that appears to have been taken inside of a hotel and referenced events taking place in Washington D.C., that evening. *See* Figure 1. In the accompanying photograph, the defendant can be seen using a phone. *Id.*



*Figure 1.*

2

On the morning of January 6, the defendant attended the "Stop the Steal" rally hosted by the former President. During the rally, the defendant tweeted an image taken from the Ellipse. While he was at the rally, the defendant wore a red hat, brown sunglasses, Mechanix brand gloves, and a red tee-shirt with an image of the former President flexing his bicep that he wore over a gray hooded sweatshirt. *See* Figure 2a. At some time between when the rally ended and approximately 2:30 p.m., the defendant changed outfits, into a black, camouflage hat with a frayed brim and a black Infowars shirt with an image of a space shuttle, that he wore over a gray hooded sweatshirt; the defendant also tied a red bandana around his neck, which he wore as a covering for the lower half of his face for the duration of his time at the Capitol. *See* Figure 2b.

 

*Figure 2a.*          *Figure 2b.*

The defendant rode in a golf cart to the area near the Grant Monument on the West Front of the United States Capitol and entered the restricted perimeter after 2:30 p.m. Inside the restricted perimeter, he approached the area known as the tunnel on the Lower West Terrace. At approximately 3:15 p.m., the defendant stood at the mouth of the tunnel. As this Court knows, and as evidence will establish, the Lower West Terrace was an area in which some of the worst battles between law enforcement and rioters occurred over a prolonged period. At the mouth of the tunnel, around 3:15 p.m., the defendant turned to the crowd, signaled them forward, and shouted "C'mon!" before charging into the tunnel himself. Inside the tunnel, the defendant engaged in synchronized

pushing against police for approximately three minutes. During this time, he also stole, tried to steal, or assisted others in stealing police officers' riot shields and passed the shields to the crowd behind him. Once the officers began pushing the rioters from the tunnel, the defendant tried again to steal an officer's shield. Seconds before being pushed from the tunnel, the defendant struck a police officer with his elbow.

After being ejected from the tunnel, the defendant remained in the vicinity of the Lower West Terrace until at least 4:50 p.m. In connection with the events in D.C., the defendant posted the following statements to social media, respectively on Twitter and Facebook:



Figure 3a. Posted at 2:10pm
on January 6, 2021.

Figure 3b. Posted at 6:29pm
on January 6, 2021.



Figure 3c. Posted on January 7, 2021.

On January 26, 2021, the FBI interviewed the defendant by phone in response to a tip. During this interview, the defendant stated that he did not enter the Capitol on January 6, 2021. Sometime during the summer of 2021, the defendant deleted all his social media accounts.[1]

2.    *Identification*

In January 2021, the FBI received two tips which stated that the defendant had been present in Washington, D.C., for the rally and was present at the Capitol. The first of these tips, which was submitted on January 8, stated that the defendant was present in Washington with another known rioter and that the defendant may have been connected to criminal activity that occurred in Washington. The second tipster, who submitted tips on January 18 and 19, provided a picture of an individual whom the tipster believed to be the defendant in the Capitol. Subsequent investigation determined that this second tipster identified the wrong person as the defendant but did provide accurate links to the defendant's social media to the FBI.

In August 2021, the FBI received another tip that the defendant had been present in Washington on January 6, 2021. This August 2021 tip also provided two screenshots from the defendant's Twitter account which alluded to the violence at the Capitol, *see* Figures 3a & 3b, and also included the screenshot of Individual-1's tweet which indicated that the defendant was in Washington on January 4, 2021, *see* Figure 1. Also in August 2021, the defendant was publicly identified in the media as having participated in violence at the Capitol. In November 2021, the FBI received yet another tip that indicated that the defendant had been present in Washington. This tip provided a video of him travelling to the riot in a golf cart wearing the camouflage hat, Infowars shirt, and Mechanix gloves.

---

[1] Days after the defendant was arrested in this case, a Twitter account with the same username, @RallyNate, became active again and has sporadically been used to post updates on the defendant's case.

B.     The Search Warrant

The defendant was charged via criminal complaint on August 18, 2023. *See* ECF 56. In connection with his forthcoming arrest, the FBI sought a search warrant. On August 24, 2023, Magistrate Judge Christy D. Comstock of the Western District of Arkansas signed the search warrant. This search warrant authorized the FBI to search the defendant's home for and seize electronic devices and evidence connected to his activities in Washington, including the clothing that he wore in the morning at the rally and the clothing that he wore at the Capitol after his outfit change, which would help corroborate the identification of the defendant as having been present at the Capitol on January 6, 2021. Certain items of the clothing for which the FBI sought authorization to search are now the subject of this motion.

In addition to enumerating the items that the defendant wore on January 6, the affidavit provided additional information regarding certain of those items: the camouflage Branded Bills baseball hat and the black Infowars t-shirt with "Space Force est. 2020" printed on it, both of which the defendant wore when he was on Capitol grounds. The defendant's hat was, based on the investigation, one that he had customized, specially ordered, and had owned for more than three years on January 6, 2021. *See* Attachment A, ¶¶ 49 n. 4, 73. This hat also had a frayed brim, indicating that the defendant appeared to wear it frequently and that it could, therefore, have some sentimental value. *See* Attachment A, ¶ 73. Second, the Infowars shirt that the defendant wore at the Capitol was, based on the investigation, part of a limited production of such shirts during the summer of 2020 and was no longer available for mass purchase. *See id.* The affidavit noted that the unique characteristics of these items indicated that they had special, non-monetary value and were less likely to be disposed of than other replaceable items. *Id.*

The affidavit also contained information about the defendant's use of digital devices. Specifically, the affidavit specified known instances when the defendant used digital devices in connection with the events in Washington, D.C. *See* Attachment A, ¶¶ 38, 40-41, 43-44, 48, 64, & 68. Among these instances was the defendant's phone communications with Individual-1, an image showing that he had a phone in his possession while was in Washington, D.C., *see* Figure 1, and screenshots of at least some of the posts that he made to social media in connection with (and during) the events at the Capitol, *see* Figures 3a-3c. The affidavit further described the technical specifications surrounding the retention of digital evidence. *See* Attachment A, ¶ 84.

The search warrant also included a non-exhaustive list of sixteen searches of residences that FBI agents had executed pursuant to lawfully issued warrants between February 2022 and June 2023. *See* Attachment A, ¶¶78-80. These searches were conducted in connection with the arrest of individuals who were being charged for participating in the riot at the Capitol. In each of the searches identified in this list, the FBI seized items such as clothing, weapons, protective gear, electronic devices,[2] and other evidence connected to the riot at the Capitol. In other words, in 2022 and 2023, law enforcement continued to seize evidence, including digital evidence and physical clothing, relevant to the riot at the U.S. Capitol in 2021.

C.      Arrest of the Defendant and Search of his Residence

On August 30, 2023, the defendant was arrested, and his home was searched pursuant to the warrant issued by Judge Comstock. During that search, the FBI recovered the red hat, red shirt, and sunglasses that the defendant wore at the "Stop the Steal" rally on the morning of January 6; the FBI did not recover any other clothing item that the defendant wore on January 6. The FBI,

---

[2] In the case of the electronic devices, many of them were subsequently determined to contain evidence of the users' participation in the riot at the Capitol, such as text messages, photos, videos, and geolocation data.

also pursuant to the terms of the warrant, seized several electronic devices. A subsequent search of these devices determined that they did not contain anything responsive to the warrant.

On September 13, 2023, the grand jury returned a superseding indictment in the case of *United States v. Jay James Johnston et al.*, 23-cr-237 (CJN), which added the defendant to the previously returned indictment The indictment charged the defendant with violations of 18 U.S.C.§ 231(a)(3), § 18 U.S.C. § 111(a)(1), 18 U.S.C. § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(E). Trial is scheduled to commence on July 15, 2024. On March 22, 2024, the defendant filed the instant motion seeking to suppress the evidence recovered at his home, including the clothing and the electronic devices recovered during the August 30, 2023, search. ECF 115 at 2. The government now responds.

## II.   <u>Fourth Amendment Principles</u>

### A.   <u>Challenging a Judicially Authorized Warrant</u>

Searches of a person's home, and any electronic devices found therein, are generally not permitted without probable cause. U.S. CONST. AMEND. IV; *see also Riley v. California*, 573 U.S. 373 (2014). There is a strong preference for law enforcement officials to seek a warrant rather to rely on exigency or another Fourth Amendment exception to justify a search. *See Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) (The "exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges."). In keeping with this strong preference, the defendant, in turn, bears a heavy burden to suppress the results of a search based on a warrant authorized by a magistrate judge because an "affidavit offered in support of a search warrant enjoys a presumption of validity." *United States v. Rhine,* 21-CR-687 (RC), 2023 WL 2682258, at *2 (D.D.C. Mar. 29, 2023) (quoting *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010))."

When deciding whether to authorize a search warrant, the "task of the issuing magistrate is simply to make a practical, common-sense determination of whether probable cause exists." *United States v. Nozette*, 692 F. Supp. 2d 110, 111 (D.D.C. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). Finding such "[p]robable cause is not a high bar," *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (cleaned up), and in challenging the sufficiency of a warrant, the defendant—not the government—bears the burden of proving the subsequent search after issuance of a valid warrant was improper. *United States v. Manafort*, 313 F. Supp. 3d 213, 219 (D.D.C. 2018) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)).

To this end, a court's scrutiny of a magistrate court's issuance of a warrant should not take the form of *de novo* review. *Gates*, 462 U.S. at 236. "A grudging or negative attitude by reviewing courts towards warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a common sense, manner." *Id.* (quoting *United States v. Ventresca*, 380 U.S. 102, 108-109 (1983) (cleaned up). Therefore, "the traditional standard of review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for concluding' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* at 236-237 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

A magistrate judge's finding of "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully reduced to a near set of legal rules." *Gates*, 462 U.S. at 232. To establish probable cause to search a residence, the affidavit must establish a "nexus" between the criminal activity and the premises to be searched. *United States v. Burroughs*, 882 F. Supp. 2d 113, 122 (Kollar-Kotelly, J.) (citing *United*

*States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993)). To satisfy the nexus requirement, the magistrate needs only to determine that there is a "reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence." *Id.* This nexus can be established by, in addition to the affiant describing the facts of the case, the affiant's reasonable inferences based on her training and experience as articulated in the affidavit. *Burroughs*, 882 F. Supp. 2d at 122-123 ("It takes a leap of logic to believe a narcotics trafficker would record transactions and store that information in a safety deposit box, but not to infer that a robber would keep cellular telephones and an iPod *in his apartment*.") (emphasis in original).

  B. <u>Staleness</u>

  Part of the analysis about whether there is probable cause to search is the recency or "freshness" of the supporting evidence in the affidavit. *See United States v. Washington*, 775 F.3d 405 (D.C. Cir. 2014); *see also United States v. Webb*, 255 F.3d 890, 904 (D.C. Cir. 2001). However, this determination of whether information is "fresh" or "stale" is not merely a rote calculus of the days elapsed since the crime. *See also Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) ("The law sensibly draws no bright-line rule for staleness."); *see also United States v. Savoy*, 889 F. Supp. 2d 78, 88-89 (D.D.C. 2012) (Lamberth, J.); *United States v. Ali*, 870 F. Supp. 2d 10, 33 (D.D.C. 2012) (Huvelle, J.) ("In determining probable cause for the issuance of a search warrant, time alone, of course, is not controlling." (quoting *Schoeneman v. United States*, 317 F.2d 173, 177-178 (D.C. Cir. 1963))).

  The question instead "is whether, at the time an affidavit is presented to a magistrate, it establishes probable cause that evidence will be found at the location of the search." *Ali*, 870 F. Supp. 2d at 33. To this point, the Circuit has provided gloss and caution when attempting to reduce a staleness analysis to a mathematical function:

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.

*United States v. Bruner*, 657 F.2d. 1278, 1298 (D.C. Cir. 1981) (citing *Andresen v. State*, 331 A.3d 78, 106 (Md. Ct. Spec. App. 1975), aff'd 427 U.S. 463 (1976).

In keeping with *Bruner*, courts in this district have used of a "totality of the circumstances" test when reviewing the warrant decision of an issuing judge. *See United States v. Ginyard*, 628 F. Supp. 3d 31, 47 (D.D.C 2022) (Kollar-Kotelly, J.) ("Based on the totality of the circumstances, Judge Wellner [of the Superior Court of the District of Columbia] had a substantial basis for concluding that evidence of a violation of animal cruelty laws would be found at [the defendant's] residence."). Moreover, when making a determination about the staleness of an affidavit for a search warrant, it is necessary to make an individualized determination about the particular warrant relative to other cases with similar charges and what courts have found regarding "staleness" in those cases. *United States v. Edelin*, 128 F. Supp. 2d 23, 46-47 (D.D.C. 2001) (Lamberth, J.). "[W]hen the evidence sought is of a type that would be maintained after the criminal activity ceased, then older information can still be considered reliable when used to obtain a search warrant." *Id.* (collecting cases wherein warrants with information aged eighteen months, two years, two and a half years, and three and one-half years was still "fresh" for purposes of the Fourth Amendment in light of the nature of the crime and the items sought). Law enforcement officials may also continue investigating a case beyond the point at which they attain probable cause because the Fourth Amendment does not require them to stop the investigation and apply for a warrant the moment they pass beyond that threshold. *See Kentucky v. King*, 563 U.S. 452, 467 (2011) ("We have said that '[l]aw enforcement officers are under no constitutional duty to call a

halt to a criminal investigation the moment they have the minimum evidence to establish probable cause.'" (quoting *Hoffa v. United States*, 385 U.S. 293, 310 (1966))).

Even if information contained in a warrant is stale, suppression is not the proper remedy. Rather, "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 919, 104 S. Ct. 3405 (1984). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Washington*, 775 F.3d at 407 (quoting *Leon*, 468 U.S. at 898). Thus "we ordinarily do not suppress evidence seized pursuant to a search warrant unless the warrant affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (quoting *Leon*, 468 U.S. at 923). This principle also applies to the staleness analysis. *See United States v. Matthews*, 753 F.3d 1321, 1325-1326 (D.C. Cir. 2014) (declining to determine whether a potential period of three years was "stale" because the officers were executing a warrant that contained "a judicial mandate to an officer to conduct a search" (quoting *Leon*, 468 U.S. at 920 n.21).

## III.   <u>Argument</u>

According to the defendant, the warrant was deficient because the evidence supporting it was "impermissibly stale." ECF 115 at 8. His focus appears to the lack of "justification or for why more than 950 days elapsed between the time it was aware of evidence . . . and when it took used [sic] that evidence as justification to seek a search warrant." *Id.* He then further argues that because the defendant was involved in a "single incident crime", the search warrant was predicated upon "stale evidence." *Id.* at 10. The defendant also claims that the affidavit lacked any evidence that

he "owned or possessed a phone on January 6, 2021 . . . or that any computer inside the residence had any connection to his alleged actions on January 6, 2021." *Id.* Finally, the defendant takes issue with the affiant's inclusion of other January 6 warrant-based searches, remarking that "the fact that evidence in *unrelated* cases involving *unrelated suspects* at unrelated locations have absolutely no relevance." *Id.* at 12 (emphasis added). The defendant's claims lack merit, and his motion should be denied.

To start, the affidavit contained significant evidence regarding the defendant's crimes and the nexus between his crimes and the evidence sought. Second, the information contained within the affidavit was not stale. The fact that the investigation took years to conclude did not vitiate probable cause or the expectation that digital devices or clothing would be found. Since the government is not seeking to introduce any evidence from the digital devices, we now focus primarily on the tangible items that the defendant seeks to suppress: the red hat, the red shirt, and the brown sunglasses, all of which were worn by the defendant on January 6, 2021 that were recovered at his residence on August 30, 2023.  These items, as well as others that were not recovered at the defendant's residence, were each described with particularity in the warrant. The defendant's ultimate complaint is solely one of freshness or staleness.

    A.    <u>The Information in the Warrant Was Not Stale</u>

In moving to suppress the evidence seized in the search, the defendant asks this court to perform precisely the type of hypertechnical reading of the affidavit that the Supreme Court has ruled it should not. *Gates*, 462 U.S. at 236 ("[C]ourts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a common sense, manner."). Based on that disfavored hypertechnical reading of the affidavit, he argues that this Court should overturn the decision of the issuing magistrate, another disfavored practice. *Id.*; *Nozette*, 692 F. Supp. 2d at 111; *Manafort*,

313 F. Supp. 3d at 219. Here, however, the totality of the circumstances within the affidavit clearly established that there was sufficient probable cause for the magistrate to issue the warrant. *Bruner*, 657 F.2d. at 1298; *Ginyard*, 628 F.Supp.3d at 47.

The defendant's motion repeatedly, if not singularly, focuses on the amount of time that elapsed between January 6, 2021, and the day of the defendant's arrest on August 30, 2023. ECF 115 at 8, 9, 11, & 15. However, by focusing his analysis on this rote measure of days and months, the defendant ignores the fluid assessment of probable cause that must be undertaken. *Bruner*, 657 F.2d. at 1298; *Savoy*, 889 F. Supp. 2d at 88-89. The age of the information contained in the affidavit is just one among many factors that a court should consider when determining if probable cause exists. *Ginyard*, 628 F. Supp. 3d at 47. A finding of probable cause turns on holistic considerations about 1) the evidence sought, 2) the location to be searched, and 3) the nature of the crime being investigated. *Bruner*, 657 F.2d. at 1298

1. *The evidence sought.*

With respect to the evidence, the affidavit amply outlined the clothing items sought and their connection to the defendant's activities on January 6, 2021. *See* Attachment A, ¶¶ 47-49. The affidavit did not rest at generalizations or boilerplate language. Rather, it provided extensive details about the specific items of clothing sought, their unique character, and their connection to the crime. *Edelin*, 128 F. Supp. 2d at 46-47 ("[O]lder information can still be considered reliable when used to obtain a search warrant" if the evidence sought is of the type that would be maintained after the crime."). The affidavit further set forth reasons to believe why the evidence sought is not "perishable." *Bruner*, 657 F.2d at 1298. In *Edelin*, the Court noted that older information may still be relied upon if the evidence sought is of the type that would be maintained after the crime as occurred. Clothing is a durable good that is not perishable like food, drugs, or even contraband.

14

Indeed, several courts have recognized that clothing connected to crimes is not stale for purposes of warrants. *See, e.g.*, *United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014) (stating clothing seen in photographs two years prior was not stale); *United States v. Baker*, 888 F. Supp. 1521 (D. Haw. 1995) (finding that clothing and jewelry were likely still in a house even after 18 months during an ongoing illegal operation); *United States v. Pelham*, 749 F. Supp. 304 (D.D.C. 1990) (black hooded sweat jacket obtained via search warrant after 6 months); *Amica v. State*, 307 Ga. App. 276, 704 S.E.2d 831 (2010) (dark colored clothing, blue Dickie pants, low-cut Timberland boots discovered 9 months after crime was committed); *Carruthers v. State*, 272 Ga. 306 (2000) (clothing obtained 6 months after crime) (overturned on other grounds by *Vergara v. State*, 283 Ga. 175 (2008)).

Clothing is drastically different than other kinds of evidence. For example, drugs move to and from an illegal market and are often physically consumed by those who possess them, and thus one would not expect narcotics evidence to remain fresh for long. *See United States v. Johnson*, 437 F.3d 69, 72 (D.C. Cir. 2006). Firearms, too, are dangerous, and in the context of those who possess such weapons illegally, often transferred or disposed of in rapid fashion.  *Cf. United States v. Jenkins*, 984 F.3d 1038, 1044-45 (D.C. Cir. 2021). The evidence sought in this case was not only *not* contraband or perishable, but appeared to possess non-monetary value. As discussed in the affidavit, some of the clothing was of limited distribution, such as the Infowars shirt,[3] or had been custom designed by the defendant himself, such as the Branded Bills hat. Thus, one would reasonably infer that items that have been manufactured in small, specific, or

---

[3] Branded shirts sold directly on Infowars.com commonly sell for between $25 and $35. This shirt, which is no longer available through the Infowars store and has not been available there for some time, is presently available only on after-market websites, where it is selling for more than $100. *See* eBay, "RARE🔥 Space Force Launch T Shirt XL InfoWars ALEX JONES TRUMP DISCONTINUED!", *available at* https://www.ebay.com/itm/116098380640.

customized batches would be more valuable to the person ordering them than mass-manufactured or easily replaceable products.

Further, the affidavit detailed how the defendant himself had, on January 6, 2021, already held on to at least one of the sought items, the Branded Bills hat, for more than three years. *See* Attachment A at ¶ 49 n.4 (investigation indicated that the defendant purchased that particular hat in December 2017). The defendant now claims that it is unreasonable to believe that an individual might possess such an item of clothing for three years. ECF 115 at 9.  In sum, the defendant has taken the contradictory position that it would be unreasonable to infer that he possessed this customized hat for "950+ days" when, as set forth in the affidavit, the investigation revealed that he had already—and definitively—possessed this specific hat for at least 1,102 days. This fact alone is dispositive.

In 2014, the Seventh Circuit decided *United States v. Carroll*, which illustrated how the nature of the evidence sought informs the staleness analysis.  In holding that five years was not stale in the context of a sexual exploitation investigation, the Court recognized that the inquiry must be grounded in an understanding of the behavior of child pornography collectors and modern technology. 750 F.3d 700, 704 (7th Cir. 2014). As the Court noted, "Detective Spivey's affidavit made clear that he had learned through training and experience that collectors of child pornography hoard their images for long periods of time because of the great personal value the images have for sexual gratification, the difficulty in obtaining the images […] and their value to other collectors." *Id.* The Court drew from historical precedent related to child pornography crimes, documenting that multiple year lapses did not render affidavits stale. *Id.* at 705 (collecting cases). While the Court appreciated the unique status of such child-based crimes, "each case is *sui generis*." *Id.* (quoting *Gates*). To that end, the Court's analysis included the fact that the affiant

had included information that he had "previously recovered five-year-old digitally stored pornographic images of child, while the issuing judge in [a different case in which the Court found that a warrant lacked probable cause] did not have similar information [presented to him/her]." *Id. See also United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997). (holding that ten months was not stale because, as established by the affiant, collectors of child pornography "rarely if ever" dispose of such material and store it "for long periods.").

While this case does not involve child-based crimes, the *Carroll* Court's analysis is instructive: the *Carroll* Court recognized and appreciated the fact that the affidavit in that case sufficiently explained the affiant's understanding of the crime and evidence sought, documented other instances of evidence recovery, and identified the value associated with certain types of evidence. Here, this affidavit sufficiently explained the clear, if not obvious, retention likelihood of items such as clothing—something that was not contraband—and therefore even less likely to be used up, relocated, or stored away from the home. Attachment A, ¶¶ 49 n. 4, 73. The affidavit delineated a palpable string of evidence recoveries from similarly situated defendants who had also retained evidence from the riot for a significant periods of time. *Id.* ¶¶ 78-80. It further established the unique state of the riot and its accompanying criminal activity, *id.* at ¶¶ 5-35, as well as the unique state of the clothing, *id.* at ¶ 74, as reasonably inferred.  Thus, while this defendant is not charged with or accused of a child-based crime, there is no meaningful distinction in the analysis given these particular facts.

All in all, when an affidavit that establishes a particular, unique crime, and a pattern of evidence recovery over years in the same type of criminal offense, a request to search the subject's residence to find distinctive, non-contraband clothing worn by a suspect during and around the commission of the crime is neither novel nor unreasonable, regardless of the time elapsed.

2.      *The location to be searched.*

The analysis of the evidence sought is closely tied to another consideration under *Bruner*: the area to be searched. 657 F.2d. at 1298. The area to be searched in this case was the defendant's home, where he has lived for many years. A person's home is far from a "mere criminal forum of convenience" and is instead a "secure base of operation." *Id.* Moreover, that a person's home would be likely to store their clothing does not require a sensational inference. *Burroughs*, 882 F. Supp. 2d at 122-123 (distinguishing between the leap of logic required to conclude without further detail that a narcotics trafficker would keep a record of transaction in a safety deposit box versus the ordinary logic required to conclude that someone would store stolen items in his home). That is the type of reasonable inference that is permissible, based on the affiant's training and experience, to establish the connection between the crime and the location to be search. *Id.*; *see also* Attachment A, ¶ 71.

3.      *The nature of the crime being investigated.*

Finally, the nature of the crime being investigated weighs heavily in favor of the magistrate's original finding. The defendant's overly technical reading of the affidavit attempts to place January 6 into the category of a "single incident crime" by asserting that "[t]here was no allegation that [the defendant] was engaged in an ongoing conspiracy or continuing course of criminal conduct following the events of January 6, 2021." ECF 115 at 9-10 (quoting *United States v. Lindsey*, 596 F. Supp. 2d 55, 58-59 (D.D.C. 2005) (Lamberth, J.)). That is of no moment here. January 6 has proven to be not at all like the cases that the defendant cites, *Lindsey* and *Webb*, which primarily involve the discovery of firearms and drugs in residences following isolated criminal transactions that were distant in time. ECF 115 at 9. As search after search has shown,

many January 6 defendants have retained clothing and other evidence of their participation in the events of January 6, 2021.

As this Court knows, the January 6 riot at the Capitol *is* different from other crimes. Participants in the riot extensively filmed their conduct, *see, e.g., United States v. Sullivan*, 21-cr-78 (RCL), ECF 1-1, and expressed pride in what they were doing and an awareness of the historical nature of their conduct, *see, e.g., United States v. Thomas*, 21-cr-552 (DLF), ECF 203 at 36-39. Many of the rioters at the Capitol collected souvenirs from the building, *see United States v. Harkrider*, 21-cr-117 (RCL), ECF 291 at ¶¶ 25-26 (defendant stole a broken piece of furniture), stole from the police officers defending the building, *see, e.g., United States v. Ackerman*, 24-cr-60 (TJK), ECF 22 at 2 (defendant stole a U.S. Capitol Police riot helmet that the FBI recovered from his home in June 2023), or simply kept the clothes that they wore that day, *see, e.g., United States v. Ramakrishnan*, 23-cr-247 (JMC), ECF 28 at 9-10 (defendant keep the ski jacket that he wore in the Capitol that was discovered in his home by the FBI in June 2023). Even if they were not actively stealing or gathering souvenirs, many defendants chose to keep the items that they brought to the Capitol, and a partial list of these items that have been recovered by the FBI since February 2022 *was* included in the affidavit. Attachment A, ¶¶ 78-80. The sheer aggregate quantity of crimes that took place at the Capitol on January 6, 2021, and the historic nature of those crimes, coupled with defendants consistently boasting about their involvement on that day further enhance the likelihood that people would keep stolen items or things related to that day.

The totality of the circumstances in this case amply supports the magistrate's finding of probable cause. The 67-page affidavit painstakingly described the planning and preparation of the defendant in the lead up to January 6, 2021, including his coordination with others, and outlined the criminal conduct that he engaged in on that day. It further described in detail the items sought,

and, crucially, the affiant's basis as to why those items were not of the type that would be disposed of following the commission of the crime. *Edelin*, 128 F. Supp. 2d at 46-47. Moreover, the affidavit, relying on reasonable inferences and the common fact that most people store clothes in their homes, properly established a nexus between the items sought and the location to be searched. *Bruner*, 657 F.2d at 1298; *Burroughs*, 882 F. Supp. 2d 113. Finally, the affidavit appropriately considered the larger context of the riot and its unique nature by describing items that had been seized during lawful searches as recently as two months before the search in this case. *Edelin*, 128 F. Supp. 2d at 46-47 (in a case involving a conspiracy to distribute drugs, racketeering, and multiple homicides, warrants that rely on older information are determined to be "fresh" for Fourth Amendment purposes if "the evidence sought is of a type that would be maintained after criminal activity ceased" (citing *United States v. LaMorte*, 744 F. Supp. 573, 575 (S.D.N.Y 1990) (evidence sought was of the type that would be maintained long after the criminal activity had ceased)).

The defendant feigns curiosity at the affiant's inclusion of the list of abovementioned searches of January 6 suspects, noting that those searches are "unrelated cases involving unrelated suspects at unrelated locations." ECF 115 at 12. But this is not accurate. While those searches are indeed independent searches at various locations, the searches are borne out of the same crime on the same day: illegally entering the U.S. Capitol grounds on January 6, 2021. Ignoring the varying degrees of nuances and levels of intent required by the different statutes, the defendant knowingly joined a mob bent on disruption. That mob required the presence of individual participants to magnify the collective effort. To suggest that these other cases are "unrelated" ignores the factual context entirely. Moreover, even if the cases were unrelated in a technical sense, the fact that defendants continue to possess lawful items two or three years later is neither shocking nor

unexpected. The defendant's invocation of the staleness doctrine appears to ignore years of meaningful investigation, collectively showcasing the freshness of such probable cause.

Simply put, the defendant has not met his heavy burden to overturn Magistrate Comstock's finding of probable cause. *Gates*, 462 U.S. at 236; *Rhine,* 2023 WL 2682258, at *2. The Court should, therefore, deny his motion to suppress the tangible items seized.

B.    The *Leon* Good Faith Exception Applies to the Seized Clothing

Even assuming the information contained in the affidavit was stale, the good faith exception, applies. *Leon*, 468 U.S. 897. The "exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." *Sheppard*, 469 U.S. at 990. The agents' reliance on the search warrant was objectively reasonable. The affidavit—67 pages long with 21 included images and internal references to the specific sources of the information it provided—describes in detail not just the events of January 6, 2021, but also the defendant's specific role in them and the items he had in possession that day, and was then signed by a United States Magistrate Judge. *Washington*, 775 F.3d at 407 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.") (quoting *Leon*, 468 U.S. at 898)).

The exception to this rule is that suppression may be appropriate if warrant affidavit was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Cardoza*, 713 F.3d at 659 (quoting *Leon*, 468 U.S. at 923). The defendant's reliance on *Lindsey*, 596 F. Supp. 2d 55, to support his assertion that the good faith exception would not apply in this case is misplaced. *Lindsey* involved a series of searches for firearms in residences spread out over two years, all of which were based largely on the same photograph of a child holding a firearm (this specific firearm was never found). In that case, Judge Lamberth

21

found that the good faith exception did not apply to the fruits of the final search because 1) the affidavit in support of the final search did not say when the criminal activity (i.e., the photograph) occurred, 2) the officers failed to supplement the affidavit with any new information, and 3) the officers were searching for guns that were not of any exceptional character. 596 F. Supp. 2d at 61. In this case, the affidavit provided scrupulous temporal details, often narrowing the time frame to at least a single day if not a particular minute in time. *Cf. id.* ("The first problem that should have alerted the officers that probable cause did not exist is that the affidavit in support of the warrant did not include a date for when the critical evidence [the photograph] was gathered."). The affidavit in this case was similarly supplemented with information about recent fruitful searches in other cases connected to January 6 to show that, even more than two years (let alone three years) after the events of that day, relevant evidence is still being discovered across the country. Finally, the affidavit in this case distinguished the evidence sought because it identified the items' unique characteristics and the affiant's basis for believing that they would be retained.

The deficits of the affidavit that existed in *Lindsey* do not exist in this case. The agents executing the search warrant in this case thus had a good faith basis to believe that the probable cause to search was sufficient. *Washington*, 775 F.3d at 407. Therefore, even if the information upon which they relied was stale, suppression of the evidence is not the appropriate remedy. *See Matthews*, 753 F.3d at 1325-1326 (declining to determine whether a potential period of three years was "stale" because the officers were executing a warrant that contained "a judicial mandate to an officer to conduct a search."). It can hardly be said that after an affiant submits a 67-page, fact-filled affidavit to a court and receives judicial authorization to conduct a scoped search, that any officer would be unreasonable to rely on such protection. The good faith exception, at its very core, protects the discovery of such evidence.

C.      The Search of Electronic Devices Was Supported by Probable Cause [4]

The defendant further contends that the search of electronic devices seized from his home was unlawful as the affidavit "lacked any evidence that the devices to be seized were devices possessed by [him] on January 6, 2021." Def. Mot at 10. In moving to suppress the contents of the digital devices on this basis, the defendant misstates what is required of the government's affidavit by the Fourth Amendment. The government was not required to prove that the defendant "owned" these devices. *See, e.g.*, *United States v. Smith*, 19-cr-324 (BAH), 2021 WL 2982144, at *7 (D.D.C. July 15, 2021) ("[W]here agents could not have known which device a defendant used to engage in the conduct relevant to the search, courts have upheld warrants broadly authorizing the seizure of '[a]ny computers, cell phones, and/or electronic media that could have been used as a means to commit' described offenses." (quoting *United States v. Loera*, 59 F. Supp. 3d 1089, 1151–1152 (D.N.M. 2014)). Where the "affidavit plainly provide[s] probable cause to believe that one or more of defendant's cell phones would contain evidence of the offense," as was the case here, "the warrant was not overbroad simply because it did not particularly describe the phone[.]" *Id*. The affidavit presented ample evidence that the seized devices might contain evidence of the defendant's crimes. The affidavit outlined how the defendant had a phone in his possession in Washington, used a phone to communicate with Individual-1 repeatedly from January 4 to January 7, 2021, and to post to social media about the events of January 6. Attachment A, ¶¶ 38-41, 43-44,

---

[4] The government notes that this issue is likely moot. After a search of the devices seized from the defendant's residence, the government did not find any evidence that was responsive to the search warrant and, therefore, does not intend at this time to offer any evidence from the devices during the presentation of its case-in-chief. The government notified the defendant's counsel of this fact via email on January 31, 2024. If the government changes its position on this matter, it will promptly notify the defendant through his counsel. The government reserve the right to seek admission for impeachment purposes, to the extent the defendant testifies inconsistent with what was discovered on his digital devices.

48, 64, & 68. Taken together, these facts more than showed that, at a minimum, the defendant used a phone to recount his activities at the Capitol.[5]

Moreover, the government was not required to identify, at the time it obtained the warrant, each electronic device in the defendant's possession and whether that device contained data relevant to the crimes. Such a showing would be virtually impossible in advance of the seizure and search, which is why courts frequently do not require a showing that specific devices to be seized are those involved in a crime. *See Smith*, 2021 WL 2982144, at *8 (finding "reason to believe that other devices in the residence—even if they did not belong to defendant—would contain evidence of the offense," even if those devices were not specifically identified.). The affidavit must simply set forth probable cause to believe that the defendant's electronic devices will be found in the residence and contain evidence of the defendant's crimes on January 6. Moreover, even if a specific phone recovered was not the exact phone defendant used on January 6, individuals commonly transfer data from their old phone to their new phone, so even a new device may still have evidence of the defendant's crimes on January 6, such as photos, text messages, or videos. *See* Attachment A, ¶ 84(b).

The defendant also seems to be moving to suppress the results of the search of the digital devices on the basis that the information used to establish probable cause for these devices was stale. ECF 115 at 11. The same previously discussed Fourth Amendment principles regarding staleness apply to the search of digital devices. However, courts have held, where "the records or documents in question are digital, staleness is even less of a problem" than for tangible objects.

---

[5] The affidavit explains that files on digital devices "can be recovered months or even may years after they have been downloaded" and that deleted files "can be recovered months or years later using readily available forensics tools." Indeed, the ability to retrieve "an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system" and "storage capacity." Attachment A, ¶ 84(c).

*Ali*, 870 F. Supp. 2d at 34. "[N]umerous courts have recognized that digital files remain on computers for extensive periods of time, even if they have been deleted," such that "the passage of time does not necessarily render the evidence stale." *United States v. Coon*, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011) (collecting cases). "[T]he nature of digital evidence," which "weighs against a finding of staleness." *United States v. Payne*, 394 Fed. Appx. 891, 894 (3d Cir. 2010) (quoting *United States v. Payne*, 519 F. Supp. 2d 466, 477 (D.N.J. 2007)). There is, therefore, no staleness concern with respect to the search of the defendant's devices.

## CONCLUSION

For the reasons above, the defendants' motion to suppress the results of the August 30, 2023, search of his residence should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
601 D Street NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

KAITLIN KLAMANN
Assistant United States Attorney
Illinois Bar No. 6316768
601 D Street NW
Washington, D.C. 20530
Kaitlin.klamann@usdoj.gov