### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | 1:23-cr-00237-CJN |
| **v.** | **:** | |
| **JESSE STOVER** | **:** | |

### DEFENDANT'S SENTENCING MEMORANDUM

On January 6, 2021, Jesse Stover came to Washington, D.C. from Kentucky to participate in a political protest. After arriving in Washington, D.C., he went to his hotel, and later to the Elipse for a rally with former President Donald J. Trump where he talked with fellow visitors to the city, marched, heard speeches, and joined protests that had been organized weeks prior and were the subject of permits granted throughout the National Mall and on certain areas of the United States Capitol Grounds.

Later that afternoon, certain protests became violent, and numerous individuals broke windows and forced their way through doors to breach the United States Capitol, which was closed to visitors. While inside, the individuals destroyed property, stole items, assaulted and harassed law enforcement officers, and threatened members of Congress (and their staffs), requiring them to shelter in place in fear for their safety. Multiple protestors and law enforcement officers died from heart attacks, and one protestor was killed when trying to enter a hallway that led to the Senate floor.

Nobody, especially not Mr. Stover, is disputing that January 6 was an extremely dark day in our nation's history and a national embarrassment. Mr. Stover never went into the U.S. Capitol that day. But he was present in the West Terrace tunnel, and, while present, there were several pushes against the police line that he found himself in the middle of. Pepper spray was deployed by law enforcement, and, Mr. Stover, with pepper spray in his eyes, inadvertently made contact

1

with a law enforcement officer in that instance.  And he was in the tunnel, near the back, during pushes against the police line.  In at least two instances, Mr. Stover can be heard shouting "don't hurt the police" to the others present.  And, in one instance, Capitol Police Officer Michael Fanone was knocked down, and Mr. Stover can be seen intervening in and with the crowd, pulling Officer Fanone back to the police line and away from harm.[1]

At all times since January 6, 2021, Mr. Stover has cooperated with the Government. Mr. Stover pleaded guilty to a felony offense of 18 U.S.C. 231, the only plea offer the Government (and its current prosecutors) would accept to resolve this case in lieu of trial.

Now, the Government seeks a sentence of 14 months of incarceration, even though Mr. Stover did not injure any officer, attempted at one point to protect law enforcement from the crowd, and never went inside the U.S. Capitol.  Indeed, the Government seeks 14 months of incarceration even after hundreds of individuals who actually entered the U.S. Capitol received probationary sentences or minimal days of incarceration, and when those convicted and sentenced for obstruction of an official proceeding may ultimately have their felony convictions vacated by the United States Supreme Court and have their sentences reduced to time served.

As discussed below, Mr. Stover has two misdemeanor convictions within the applicable date range (one of which would have aged off if the calculation was performed not from the date of the offense but from the date of the indictment or the date of sentencing), and is a two point criminal history point offender.  He supports his spouse and their two minor children, one of whom has a severe disability, as a small business owner that employs a handful of people.  He is not involved in any radical militia groups or associated with any group responsible for the attack on the

---

[1] We are transmitting a flash drive to chambers with the video clips of these events herewith, and intend to play them at sentencing.

U.S. Capitol. He has limited social media presence (and no posts about the events of January 6). After growing up in difficult conditions, he has supported his family. Since his arrest nearly a year ago, Mr. Stover has been in 100% compliance with his release conditions.

Mr. Stover's conduct on January 6, 2021, where he never encroached into or entered the U.S. Capitol building and never injured law enforcement officers (and in fact intervened to prevent injury to law enforcement officers), does not warrant a sentence of incarceration in this case, particularly when considered together with his cooperation with the Government from the earliest possible moment, his sincere acceptance of responsibility, and the lack of any serious criminal history. As expressed by his wife, family, friends, and others in the letters submitted on his behalf, Mr. Stover's contributions to others, acceptance of responsibility, and good deeds warrant leniency and an opportunity to prove to this Court, through a lengthy period of supervision, that he is someone who can atone for his actions and continue to be a beneficial person to his family and community.

In our country, we judge a man by *his* actions alone, not those of others; we evaluate one-day in a man's life, alongside all the other days in his life; we reward those who sincerely accept full responsibility for their actions; and we value actions taken to cooperate with the Government in its investigation and prosecution. These values support a sentence of probation in this case.

## I.      FACTUAL BACKGROUND

### 1.  Personal Life and Family History

William Ernest Stover, IV, who goes by Jesse, was born on June 19, 1977, in Grand Rapids, Michigan to William E. Stover, III and Wanda Stover. (Stover, PSR, at ¶79). His father passed away in 2013 from a heart attack. *Id.* His mother, Wanda, age 69, resides close by and is retired. *Id.* His biological father was extraordinarily abusive, which included physical abuse

directed primarily towards his mother, resulting, ultimately, in he and his mother moving out when he was approximately five years old. *Id.* at ¶80.

Mr. Stover completed the eleventh grade, in Battle Creek, Michigan, but dropped out in 1996 to work for a laborer's union, to support his girlfriend Stacy Jean Fox (who later became his first wife) when she became pregnant. *Id.* at ¶96. He later completed his GED in 1999. *Id.* at ¶99. He did one semester of community college in 2000. *Id.* at ¶100.

In 1996, Mr. Stover married Stacy Jean Stover (nee: Fox) in Battle Creek, Michigan. *Id.* at ¶80. They had three children together, who live near Mr. Stover in Elizabethtown, Kentucky. *Id.* They divorced in 1997, and have three children together, Troy Stover, age 27; Trevor Stover, age 25; and Taylor Stover, age 23. *Id.* They all reside in Elizabethtown, Kentucky. *Id.* Stacy committed suicide in 2011, in the presence of Mr. Stover, causing significant suffering for him. *Id.* at ¶84.

Mr. Stover moved to Kentucky in 2006. *Id.* at ¶88. He married Jocelyn Stover in 2011, and they both reside in Elizabethtown, Kentucky, with their two children, Sanders (age 11) and William Elias Stover IV (who goes by Elias, age 7). *Id.* at ¶85. Jocelyn is a stay-at-home mother and assists with her husband's business when she is able. *Id.* at ¶86. Their youngest son, Elias, is severely disabled and therefore Mrs. Stover is his primary caretaker. *Id.* Elias was diagnosed with Rett Syndrome as an infant and requires physical support around-the-clock [Rett syndrome is a rare genetic neurological disorder that occurs almost exclusively in girls, more rarely in boys, and leads to severe impairments, affecting nearly every aspect of the child's life: their ability to speak, walk, eat, and even breathe easily]. *Id.* He attends doctor's appointments regularly. *Id.* Elias has Medicaid and receives a Social Security compassionate allowance due to

his severe mental and physical disabilities. *Id.*  Mr. Stover also pays out of pocket for medical care for his son.  *Id.*

Mr. Stover has been diagnosed with high blood pressure in 2017, and with anxiety, insomnia, and post-traumatic stress disorder (PTSD) in 2019, which is related to the suicide of his first wife – all of which is attempted to be controlled with medication.  *Id.* at ¶¶ 92-94.

## 2. Work History

Mr. Stover is self-employed, as the owner and operator of Piles Carpet Care, having purchased the business in 2016 from the prior owner, Jim Piles.[2]  PSR at ¶¶ 104-105.  The business itself, as its website indicates, is engaged not only in carpet cleaning, but also in water restoration and mold remediation.   Mr. Stover nets approximately $70,000 annually from the business.  PSR at ¶ 105.  The business employs six people on a part time basis.  *Id.*  Mr. Stover has specialized training and skills in carpet installation, flooring, and fire/mold restoration, as well as certifications in water restoration, mold mitigation, and structural drying.  *Id.* at ¶ 102. That permits him to write estimates for jobs with insurance companies following a water loss, which is a central component that constitutes more than 60% of the business' annual revenue. *Id.* at ¶ 107.  Should the Court impose a lengthy term of incarceration, it will result in the loss of the business – none of the current employees have the required certifications to write these estimates, and there is no one else capable of doing so.  *Id.* at ¶ 107.[3]

## 3. Acceptance of Responsibility

---

[2] https://www.pilescarpetcare4u.com/ (last accessed 4/26/2024).

[3] The undersigned counsel has conferred with Mr. Stover and Mrs. Stover about this, and a short period of confinement, e.g. 30 days or less, or intermittent confinement could permit Mr. Stover to conduct the required tasks to keep the business afloat that requires his certifications (the certifications concerning restoration projects and estimating); longer periods of incarceration would likely result in the loss of the business, pipeline, insurance company referrals, and this would likely take several years to rebuild, if it could ever be rebuilt.

Mr. Stover has cooperated with law enforcement.  Mr. Stover, in a timely manner, agreed to plead to a felony offense in advance of the scheduled trial.  Since January 6, 2021, Mr. Stover has regretted his actions on that day and has shown sincere acceptance of responsibility for those actions, which is memorialized in his letter to the Court (*see* letter attached hereto, A001-A002):

As reflected in the attached letters, Mr. Stover accepts responsibility for his actions. (A001-A002).  He acknowledges that his actions have had and will continue to have a significant and lifelong impact on him and his family.  Id.  And he expresses deep regret.  Id.

His wife, Jocelyn Stover likewise recounts the difficult upbringing Mr. Stover had, the impact that the charges and prospect of incarceration have had on the family and the small business Mr. Stover runs.  (A003-A004).  Significantly, she recounts the severe and significant impact that their youngest son has with severe disability from Rett's syndrome, requiring around the clock care.  Id.

Letters from family, including his mother, daughter, and son in law, describe him as a hard-working family man.  (A005-A010).  Several letters describe him as someone who would give a person in need the shirt off his back.  (A005, A007).  Others describe his work ethic and character as honest, polite, helpful and sincere.  (A0014).  And he is described as a man of "character, integrity and hard work."  (A0015).

### 4.  The nature and circumstances of the charged offenses

As set forth in his statement of offense, Mr. Stover made physically contact with a law enforcement officer – he was pepper sprayed, blind, and reached out.  While that contact was inadvertent, Mr. Stover acknowledges that his presence in the West Terrace Tunnel where pushes against police lines were occurring was wrong.  The Government spends more than seven

pages of its sentencing memoranda speaking about what *generally* happened in the Tunnel, rather than focusing Mr. Stover's involvement.

The Government argues that Mr. Stover must have been helping rioters at the front of the line when things were passed over his head and he put his hands up and grabbed them (rather than being hit in the head with them).  (Govt. Memo at 10-11).  The Government then acknowledges that Mr. Stover's role in the heave-ho efforts in the tunnel was "still mostly standing passively in the back."  (Govt. Memo at 12).  The Government then describes Mr. Stover's role in the tunnel as "watch[ing]" and "hear[ing]" the actions of others.  (Govt. Memo at 13).  The Government correctly notes that Mr. Stover can be seen, at about 3:09 p.m., pushing against the crowd near the back of the tunnel that was pushing against the police line for about 30 seconds.  (Govt. Memo at 14).  The Government also correctly notes that Mr. Stover again pushed against the crowd near the back of the tunnel that was pushing against the police line at 3:16 p.m. for less than a minute.  (Govt. Memo at 15).  In both instances, and as Mr. Stover's letter to the court indicates, people were pushing against Mr. Stover from the back in the crowded tunnel, and that caused him to push against those in front of him.  (Stover letter).  The Government suggests that Mr. Stover was somehow following hand signals by those at the entry of the tunnel (Govt. Memo at 15), but that is highly suspect, and, as Mr. Stover's letter indicates, the events that day were chaotic, and as he was being pushed, it caused him to push against those in front of him.  (Stover letter).

The Government then suggests that Mr. Stover had a clear view of the assault on Officer Fanone.  (Govt. Memo at 16-17).  The inference that the Government makes by this statement is that Mr. Stover should have done something about the assault on Officer Fanone.  Incredibly, the Government fails to inform the Court that Mr. Stover underlying did intervene in the assault on

Officer Fanone, yelling at others to stop, and ultimately helping to pull Officer Fanone back up and back to the police line.  (See video, submitted herewith).  That mitigation is both substantial and significant, and yet not one mention is made about it by the Government, with the Government spending significant space in its sentencing memoranda describing the assault on Officer Fanone, arguing that that assault is a basis for its mid-guidelines range sentence in this case, and inferring that Mr. Stover should have done something about the assault on Officer Fanone.  (Govt. Memo at 3, 5, 6, 16-17).

The insinuation that Mr. Stover should be held responsible for the assault on Officer Fanone, when Mr. Stover actually pulled Officer Fanone to safety, is not a hard blow, but a foul blow, and over the line of mere zealous advocacy.  It is reminiscent of the conduct by the Government that brought about the observation by the United States Supreme Court in *Berger v. United States*, 295 U.S. 78, 88 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

The Government then points to a 23-minute window in which Mr. Stover is merely standing around, and points to things others were doing (and admits that is what Mr. Stover was doing – standing around).  (Govt. Memo at 17-19).  The Government then points out that Mr. Stover pushed himself up on the wooden bracing – but Mr. Stover's letter makes clear that he was being pushed against, pepper spray was in the air, and he was trying to raise himself out of the crowd to breathe.  (Stover letter).  The Government then again argues that Mr. Stover stood

by and watched as others harmed law enforcement.  (Govt. Memo at 22).

**II.    ARGUMENT**

    **A.  The Sentencing Guidelines, Statutory Factors, and Other Considerations Support a Sentence Below the Guidelines.**

Mr. Stover faces sentencing on one felony charge, 18 U.S.C. §231 which does not require this Court to impose a term of incarceration. Rather, the sentencing factors of 18 U.S.C. § 3553 require this Court to formulate a sentence which is sufficient to accomplish the purposes of sentencing (as addressed below). Accordingly, so long as this Court determines Mr. Stover's sentence is sufficient as to him, it is appropriate for purposes of 18 U.S.C. § 3553(a) and takes its appropriate place in the grand scheme of the criminal justice system.

    **1.  Sentencing Discretion and Section 3553 Statutory Factors.**

The Guidelines are only advisory despite their mandatory language. *See United States v. Booker*, 543 U.S. 220, 245 (2005). A district court must therefore "consider Guidelines ranges," but is permitted "to tailor the sentence in light of other statutory concerns as well." *Id.*  The Supreme Court in *Gall v. United States,* 552 U.S. 38, 49-50 (2007) outlined the process to follow:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, *after giving both parties an opportunity to argue for whatever sentence they deem appropriate*, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, *he may not presume that the Guidelines range is reasonable*. He must make an individualized assessment based on the facts presented.

*Id.* (emphasis added) (citations and punctuation omitted).

Thus, in fashioning an appropriate sentence, this Court must consider the Guidelines along with the other factors set forth in 18 U.S.C. § 3553(a) (*see Booker*, 543 U.S. at 260; U.S.

Sentencing Comm'n, Guidelines Manual (Nov. 2023) (hereinafter, "USSG")), and treat the

Guidelines "as one factor among several" that § 3553(a) requires courts to consider. *Kimbrough*

*v. United States*, 552 U.S. 85, 90 (2007).

Pursuant to 18 U.S.C § 3661, "[n]o limitation shall be placed on the information

concerning the background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purposes of imposing an appropriate

sentence." Further, under 18 U.S.C. § 3582, the court, in considering the factors in § 3553(a) and

their applicability, should recognize "that imprisonment is not an appropriate means of

promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added).

Although the guidelines range will generally align with the objectives of the § 3553(a)

factors, that is not always the case. As the Supreme Court said in *Kimbrough*:

> [I]n the ordinary case, the Commission's recommendation of a sentencing range will
> reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. *The
> sentencing judge, on the other hand, has greater familiarity with the individual case and
> the individual defendant before him than the Commission or the appeals court. He is
> therefore in a superior position to find facts and judge their import under § 3553(a) in
> each particular case.* In light of these discrete institutional strengths, a district court's
> decision to vary from the advisory Guidelines may attract greatest respect when the
> sentencing judge finds a particular case outside the heartland to which the Commission
> intends individual Guidelines to apply.

552 U.S. at 109 (emphasis added) (citations and punctuation omitted).

As one district court has framed it, the Guidelines' "most fundamental flaw is the notion

that the complexity of human character and conduct can be rationally reduced to some arithmetic

formula." *See* Terry Carter, Rakoff's Stance on the SEC Draws Fire, Praise—and Change: The

Judge Who Said No, ABA Journal, Oct. 2013, at 53.

### 2. Applicable Sentencing Guidelines Range.

According to the Presentence Report writer, through application of USSG §§ 2X5.1 and

§2A2.4 (for obstructing or impeding officers), Mr. Stover's base offense level is 10, he received

a three-point enhancement under § 2A2.4(b)(1) for contact with law enforcement (direct or

indirect), and a two point adjustment for cooperation under §3E1.1(a), for an offense level of 11.

With two points of criminal history, he has an advisory guidelines range of 10 to 16 months, and

placing him within "Zone C" of the guidelines.  As the Presentence Report writer confirmed,

"[s]ince the applicable guideline range is in Zone C of the Sentencing Table, the minimum term

may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that

includes a term of supervised release with a condition that substitutes community confinement or

home detention according to the schedule in USSG §5C1.1(e), provided that at least one month

is satisfied by imprisonment. USSG §5C1.1(d), meaning that the recommendation is such that

half the sentence be served incarcerated and the other half in community confinement or home

detention. USSG §5C1.1."

The Presentence Report writer further, and correctly, notes that there are grounds for a

downward deviation from the guidelines in this case, namely:

> The Court may take into consideration that Mr. Stover is the sole provider for his household. The defendant has two minor children living at home. He has a special needs son that requires 24-hour care and out of pocket medical expenses. Because the defendant's wife is the primary caregiver for their son, she is unable to work. For this reason, the Court may vary downward from the advisory guidelines.  PSR at ¶155.

### 3. A Below-Guidelines Sentence Is Appropriate in This Case.

District courts may impose a sentence below the Guidelines range through either a

"departure" or "variance." *See United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021). A

"departure" is typically a change from the final sentencing range computed by examining the

provisions of the Guidelines themselves. It is frequently "triggered by a prosecution request to

reward cooperation . . . or by other factors that take the case 'outside the heartland' contemplated

by the Sentencing Commission when it drafted the Guidelines for a typical offense." *United*

*States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (citation and punctuation omitted). "A

'variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise

properly calculated final sentencing range based on application of the other statutory factors in

18 U.S.C. § 3553(a)." *Id.* (citation omitted); see also USSG § 1B1.1(c).

 Pursuant to 18 U.S.C. § 3553 (and specifically those portions of it that are applicable to

this sentence), factors this Court is to consider in imposing the sentence, which should be

sufficient, but not greater than necessary, to comply with the purposes of sentencing are:

> (1) the nature and circumstances of the offense and the history and characteristics of
> the defendant;
> (2) the need for the sentence imposed —
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to
> provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical
> care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for—
> (A) the applicable category of offense committed by the applicable category of
> defendant as set forth in the guidelines—
> …
> (6) the need to avoid unwarranted sentence disparities among defendants with similar
> records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

 Here, Mr. Stover should receive a variance from the Guidelines, as the applicable §

3553(a) sentencing factors support a non-custodial sentence in this case.

### a.  The Nature and Circumstances of the Offense.

 In various sentencing memoranda concerning January 6, 2021, the Government has

recognized that not all actors are equal in terms of culpability. The Government also has

systemically been setting forth factors for judges to consider in relation to January 6, 2021

sentences,[4] including: (i) whether, when, and how the defendant entered the Capitol building; (ii) whether the defendant engaged in any violence or incited violence; (iii) whether the defendant engaged in any acts of destruction; (iv) the defendant's reaction to acts of violence or destruction; (v) whether during or after the riot, the defendant destroyed evidence; (vi) the length of the defendant's time inside of the building, and exactly where the defendant traveled;[5] (vii) the defendant's statements in person or on social media; (viii) whether the defendant cooperated with, or ignored, law enforcement; and (ix) whether the defendant otherwise exhibited evidence of remorse or contrition.[6] We submit that one additional factor should also be considered: (x) whether the defendant was involved with planning or coercing the events of January 6, 2021.[7]

Mr. Stover never entered the Capitol, never engaged in violence, never destroyed property, attempted to intervene to protect law enforcement – including pulling an officer who was knocked down by others back to his feet, never destroyed evidence, had no time inside the building, made no statements on social media, and has cooperated in this matter.  Mr. Stover has expressed remorse, and has accepted responsibility for his actions on January 6, 2021.  And Mr. Stover was not involved with any planning or coercing the events on January 6, 2021.  Under those factors, then, this case calls for a more lenient sentence.

### b.  Defendant's History and Characteristics, Nature of the Offense.

Mr. Stover is by all accounts, a hard-working, dedicated, and kind-hearted husband, father, and small business owner, someone who pulled himself up from poverty and a difficult

---

[4] *See United States v. Reeder*, No. 21-cr-166, Gov't Sent. Mem. at 6-7 (D.E. 26).
[5] *See United States v. Morgan*, No. 21-cr-00164, Gov't Sent. Mem. at 6 (D.E. 22) (identifying location in the Capitol as a relevant factor and questioning whether the defendant entered specific areas).
[6] *See, e.g.*, *United States v. Morgan*, No. 21-cr-164, Gov't Sent. Mem. at 6 (D.E. 22).
[7] *See, e.g.*, *United States v. Morgan*, No. 21-cr-164, Gov't Sent. Mem. at 6 (D.E. 22).

childhood, with a family who loves and supports him. *See* Letters, attached hereto. As described

in the numerous letters submitted, Mr. Stover had a difficult start in life, but nonetheless has

lived a decent life of service to his family and his community, both of which care deeply about

him. *Id.*

Notwithstanding the challenges he has faced, Mr. Stover is not a violent person and poses

no danger to society, as evidenced by the Government's willingness to let him live in the

community for the past year, self-surrender when initially charged, and remain released on his

personal recognizance. He has a couple minor convictions for drug possession 11 years ago, and

a 2019 disorderly conduct conviction.  Moreover, as discussed extensively above, Mr. Stover

immediately took responsibility for his conduct and cooperated with law enforcement.

### c. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

The events of January 6, 2021 were both serious and tragic, yet, as reflected above, not

every actor that day has equal culpability. Is it appropriate to treat Mr. Stover the same as those

who set out to injure law enforcement (or did so), or those who organized and incited others to

act, or even worse, those who injured law enforcement?  To ask these questions is to answer

them. The appropriate consideration under this statutory factor is not whether the events of

January 6, 2021 were serious (because there is no dispute that they were). Instead, the

appropriate consideration is to weigh and judge each defendant's activities and involvement in

the events of that day separately. We submit that consideration of Mr. Stover's conduct relative

to the factors set forth above, and articulated by the Government in other sentencing memoranda

related to January 6, 2021 cases, supports leniency in sentencing.

Over 1,300 individuals have been charged in connection with the events of January 6,

2021, some with felonies and some with misdemeanors. Each of these cases involves a wide range of conduct, committed before, during, and after January 6, 2021, by each particular defendant. Each of these cases should be judged based on the defendant's individual conduct and not the conduct of others. Given these factors and for the reasons discussed above, a non-custodial sentence is appropriate here.

### d. Adequate Deterrence (Specific and General).

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. See 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). Specific deterrence is obtained for the defendant by the prosecution and conviction itself. The personal and reputational consequences Mr. Stover has suffered are more than sufficient to discourage him from engaging in similar conduct. Mr. Stover has also grown significantly since this offense, and recognizes the importance of continuing to improve, both for himself and for his life partner, his family, and his community.

As for general deterrence, several observations can be made. First, the prosecution itself (and the publicity of conviction) all serve as a significant general deterrence. *See, e.g., Wayte v. United States*, 470 U.S. 598, 607 (1985) (observing that any prosecution has a "general deterrence value"); *United States v. Gamarra*, 940 F.3d 1315, 1321 (D.C. Cir. 2019) (observing that prosecution itself provides general deterrence). If that is true generally, it is especially true here.

The charges in this case received national and local press.[8] There is every indication that the public condemnation of Mr. Stover will continue for the foreseeable future. Unlike various other federal charges (besides other defendants in January 6 cases), no one would want to expose themselves to the level of vitriol that is being attributed to January 6 defendants — regardless of the level of their participation or the severity of their particular charges.  The point of this observation is that the publicity involved in these cases itself provides significant general deterrence, unlike any run of the mill federal case. When whatever sentence this Court imposes is completed, the headlines will remain. January 6, 2021 will be a day that lives in infamy, and, for those who were charged in connection with the events at the Capitol, it will be a lifelong blemish on their record.

Some mention should also be made of the *lifetime* forfeiture of civil rights that Mr. Stover will suffer as a consequence of his conviction in this case.  As the Court knows, Mr. Stover lives, and operates a business in Kentucky – he is tied to the Commonwealth and will not be leaving. Kentucky imposes a *lifetime prohibition* on the exercise of important civil rights – voting, serving on a jury, or holding any public office – for *any* federal felony conviction.[9]  Of course,

---

[8] https://www.courier-journal.com/story/news/crime/2023/07/12/william-stover-charged-in-connection-with-jan-6-insurrection/70407305007/ (last accessed 4/26/2024); https://www.thenewsenterprise.com/news/crime_and_courts/elizabethtown-man-arrested-in-connection-to-capitol-breach/article_3884849f-7769-5aa0-a112-0920a5948522.html (last accessed 4/26/2024); https://www.kentucky.com/news/local/crime/article277242583.html (last accessed 4/26/2024); https://www.whas11.com/video/news/local/kentucky-man-arrested-on-felony-charges-for-actions-during-capitol-riot/417-38881f5d-19e6-4a92-af2e-95206d5e5288 (last accessed 4/26/2024); https://www.k105.com/2023/07/13/elizabethtown-man-charged-for-his-role-in-jan-6-riot-at-u-s-capitol/ (last accessed 4/26/2024).

[9] The Governor of Kentucky issued an executive order in 2019 relieving certain state felons from lifetime disenfranchisement, but this does not extend to federal felons. Ky Const. § 145; *see, also*,  https://civilrightsrestoration.ky.gov/Pages/qualify.aspx (last accessed 4/26/2024).

Mr. Stover will also be permanently prohibited, for the rest of his life, from possessing a firearm as a result of the conviction.  18 U.S.C. 922(g)(1).

Clearly, Mr. Stover has already faced significant consequences for his actions and just deterrence has been imposed, especially when he never entered into the U.S. Capitol on January 6, 2021. Furthermore, while the events of January 6, 2021 were unacceptable by any measure, and must be deterred from ever occurring again, it would be inappropriate to treat every participant in that event equally, without regard to the circumstances of their involvement, and without regard to the cooperation and acceptance of responsibility they exhibited afterwards.

### e.  Kinds of Sentences Available.

A sentence of incarceration is not always necessary in order to satisfy the sentencing mandate. Indeed, in holding that a sentence of probation was reasonable, the Supreme Court in *Gall v. United States*, cited to the district court's memorandum, which noted that probation (or post-release supervision), "rather than an act of leniency, is a substantial restriction of freedom." 552 U.S. 38, 44 (2007) (punctuation omitted). The district court also emphasized that the defendant would have to "comply with strict reporting conditions," and would "not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court." *Id.*

This Court may also consider a sentence with a period of home detention, which has been defined by the Guidelines as:

> [A] program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, education or training programs, and such other times as may be specifically authorized.

Electronic monitoring is an appropriate means of surveillance and ordinarily should be used in connection with home detention. However, alternative means of surveillance may be used so long as they are as effective as electronic monitoring.

USSG § 5F1.2, Commentary, n.1.

Based upon the information contained in this submission, and given the mandate of 18 U.S.C. § 3553(a)(3) for the Court to consider "the kinds of sentences available," a community service order would also satisfy the goals of sentencing.  A 2001 publication of the Administrative Office of the United States Courts described community service as "a flexible, personalized, and humane sanction," and "offers a way for the offender to repay or restore the community." Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (Feb. 2001). It is "practical, cost-effective, and fair — a 'win-win' proposition for everyone involved." *Id.* It is also recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows offenders to atone or 'make the victim whole' in a constructive way[, and] . . . may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.*

In selecting an appropriate candidate to perform community service, United States Probation recommends as follows:

> Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.  *Id.*

As discussed below, Mr. Stover requests and recommends a sentence of three years of supervision, to include home detention, community service, and restitution.

**B.  The Need to Avoid Unwarranted Sentencing Disparities.**

The Court directed both the United States and the Defendants, after accepting guilty pleas in this case, to pay close attention to this factor in their respective sentencing memoranda and that it wanted a comparison to other similar cases, and indicated that the analysis of comparator cases would play a heavy role in sentencing.

Two observations prior to conducting the comparator analysis.  First, the facts and circumstances of each case matter, and so, as we conduct the comparison here, in addition to looking at the charge and offense, we also analyze the conduct of Mr. Stover and other salient facts in comparison to the comparator case, both the mitigating and aggravating.  And second, we have generally excluded, as comparators, those cases that include not only a 18 U.S.C. § 231 charge, but also include other (usually more serious) charges – for instance, someone who violated 18 U.S.C. § 231, but then entered the Capitol, assaulted and injured law enforcement, destroyed property and engaged in planning activities, resulting in multiple felony convictions, is not an appropriate comparator.  We also excluded cases where the underlying facts were clearly distinguishable.

As for Mr. Stover's request for a non-incarceration sentence, if those who breached the U.S. Capitol on January 6, 2021 can be afforded a second chance and probation, so too can Mr. Stover. Below are the names (71 in total) of every January 6, 2021 Capitol breach defendant for whose conduct the Government did not even seek a sentence of incarceration:[10]

| | | |
|---|---|---|
| Morgan-Lloyd, Anna | Ehrke, Valerie | Bissey, Donna |
| Hiles, Jacob | Wangler, Douglas | Harrison, Bruce |
| Bustle, Jessica | Doyle, Danielle | Bennett, Andrew |
| Mazzocco, Matthew | Rosa, Eliel | Gallagher, Thomas |
| Vinson, Thomas | Dillon, Brittainy | Sanders, Jonathan |
| Fitchett, Cindy | Sweet, Douglas | Cordon, Sean |

---

[10] See Government's Sentencing Table of January 6 Capitol Defendants, dated February 12, 2024. https://www.justice.gov/usao-dc/media/1331746/dl?inline

| | | |
|---|---|---|
| Wilkerson, John | Jones, Caleb | Brown, Terry |
| Wrigley, Andrew | Parks, Jennifer | Reimler, Nicholas |
| Miller, Brandon | Miller, Stephanie | Hatley, Andrew |
| Pert, Rachael | Winn, Dana | Wickersham, Gary |
| Schwemmer, Esther | Kelly, Kenneth | Straka, Brandon |
| Sizer, Julia | Blauser, William | Barnard, Richard |
| Witcher, Jeffrey | McAlanis, Edward | Lollis, James |
| Schubert, Amy | Schubert, John | Orangias, Michael |
| Quick, Michael | Reda, Kenneth | McCreary, Brian |
| Colbath, Paul | Lewis, Jacob | Lentz, Nicholes |
| Daughtry, Michael | Juran, John | Genco, Raechel |
| Macrae, Douglas | Seymour, Paul | Ferguson, Jamie |
| Fontanez-Rodriguez, Samuel | Bostic, Karegan | Bostic, Willard Jr. |
| McFadden, Tyrone | Mileur, Aaron | Williams, Carrie |
| Rutledge, Meghan | Saer, Lilith | Cantrell, Eric |
| Smith, Gary | Kuecken, Deborah | Traugh, Christina |
| Culbertson, Alan Scott | Harrison, Jeremy | Ramakrishn, Karthik |
| Connolly, Kim Marie | Pacheco, Angelo | |

The above list does not even include all the January 6 Capitol breach defendants for whom the Government sought a sentence of incarceration at sentencing, but judges in this District refused to impose a period of incarceration (172 in total):

| | | | |
|---|---|---|---|
| Cordon, Kevin | Abual-Ragheb, Rasha | Nelson, Brandon | Markofski, Abram |
| Marquez, Felipe | Mariotto, Anthony | Edwards, Gary | Tutrow, Israel |
| Kostolsky, Jackson | Rusyn, Michael | Sells, Tanner | Walden, Jon |
| Prado, Nicole | Williams, Vic | Wiedrich, Jacob | Stepakoff, Michael |
| Wilson, Zachary | Wilson, Kelsey | McAuliffe, Justin | Williams, Andrew |
| Leffingwell, Mark | Sunstrum, Traci | Gonzalez, Eduardo | Strong, Kevin |
| Nalley, Verden | Carico, Michael | Loftus, Kevin | Kelley, Kari |
| Martin, Zachary | Cudd, Jenny | Jackson, Micajah | Ivey, Bryan |
| Burress, Gabriel | Pettit, Madison | Fee, Thomas | Zlab, Joseph |
| Fox, Samuel | Hardin, Michael | O'Malley, Timothy | Rebegila, Mark |
| Conover, Thomas | Krzywicki, Carla | Kulas, Christian | Kulas, Mark |
| Von Bernewitz, Eric | Ballesteros, Robert | Peart, Willard | Spain, Jr., Edward |
| Chapman, Robert | Tagaris, Jody | Sywak, William Jason | Sywak, William Michael |
| Laurens, Jonathan | Cunningham, Christopher | Torre, Benjamin | Suarez, Marissa |
| Todisco, Patricia | Persick, Kerry | Buckler, Matthew | Cavanaugh, Andrew |
| Ortiz, Christopher | Homer, Lisa | Fracker, Jacob | Vollan, Cody |
| Thurlow, Steven | McNicoll, Lois Lynn | Youngers, Darrell | Carollo, Anthoy |
| Bratjan, Frank | Ferreira, Leticia | Connor, Francis | Ferrigno, Antonio |
| Lunyk, Anton | Vincent, Reva | Ayres, Stephen | Hentschel, Cara |
| Munn, Dawn | Munn, Joshua | Munn, Kayli | Munn, Kristi |
| Munn, Thomas | Munger, Jeffrey | Rodean, Nicholas | Mels, James Allen |
| Clark, Christy | Clark, Matthew | Spigelmyer, Paul | Uptmore, James |
| Brooks, James | Yazdani-Isfehani, Abigail | Yazdani-Isfehani, Loruhamah | Comeau, Jason |
| Evans III, Treniss | Castle, Trudy | DiFrancesco, Kimberly | Wood, Matthew |
| Wiersma, David | Frankowski, Dawn | Buxton, Jonas | Billingsley, Steven |
| Gross, Juliano | Council, Matthew | Johnson Jr, Thaddis | Bond, Stacy Lee |
| Conlon, Paula | Witzemann, Shawn | Slaeker, Tyler | Montalvo, Matthew |
| Gable, Levi | Faulkner, Luke | Javid, Iraj | Lanham, Melanie |

| | | | |
|---|---|---|---|
| Gleffe, Marcos | Heathcote, Chad | Manwaring, Susan | Bustos, Alexis |
| Bustos, Bryan | Myers, Rachel | Grover, Logan | Cramer, Country |
| Gordon, Vaughn | Gerwatowski, Eric | Ambrose, Lawrence | Tilley, Todd |
| Montoya, Samuel | Weibling, Adam | Cronin, Kevin | Massie, Kenneth |
| Hallon, Luis | Gould, John David | Jones, Brian Raymond | King, Patrick John |
| Horvath, Ian | Gerding, Christina | Gerding, Jason | Bokoski, Bradley |
| Bokoski, Matthew | Chiguer, Stefanie | Cohen, Menachem | Temple, Cole Andrew |
| Smith, Justin Michael | Greene, Michael | Hart, Timothy Allen | Gallman, Joei |
| Gallman, William | Isaacs, William | Parker, Sandra | Parker, Bennie |
| Machacek, Brennen | Schulz, Kenneth | Etter, Jeffrey | Hellonen, Dodge |
| Llamas, Saul | Messer, Walter | Siemers, Jordan | Coomer, Micah |
| Abate, Joshua | Preller, Brian | Yavoich, Andrew | Dodge, Russell |
| Krauss, David | Krauss, Nicholas | Ardolino, Vincent | Cotton, William |
| Weyer, Conlin | Chang, Julio C | Torrens, Eric | Gruppo, Leonard |
| Vinson, Lori | Griffith, Jack | Ryan, Jennifer | Stotts, Jordan |

Comparator cases for a 18 U.S.C. § 231 conviction include the following:

| Defendant and case | Charge(s) | Govt. Recommended Sentence | Sentence Imposed |
|---|---|---|---|
| Hart, Timothy Allen, 1:21-CR-540-DLF | 18 USC 231(a)(3) | 4 months' incarceration 36 months' supervised release $2,000 restitution | 36 months' supervised release $2000 restitution |
| Preller, Brian, 1:23-CR-00045-TMN | 18 USC 231(a)(3) | 8 months' incarceration 36 months' supervised release $2,000 restitution | 60 months' supervised release 40 hours' community service $2,000 restitution |
| Gerwatowski, Eric, 1:22-cr-125-JMC | 18 USC 231(a)(3) | 3 months' incarceration 36 months' supervised release $2,000 restitution | 24 months' probation 30 days' home detention 60 hours' community service $2,000 restitution |
| Council, Matthew, 1:21-CR-00207-TNM | 18 USC 231(a)(3) 18 USC 111(a)(1) 18 USC 1752(a)(1) 18 USC 1752(a)(2) 40 USC 5104(e)(2)(D) 40 USC 5104(e)(2)(G) | 30 months' incarceration 36 months' supervised release $2,000 restitution | 60 months' probation 6 months' home detention 100 hours community service $2,000 restitution |
| Yang, Tyng, 1:23-CR-00100-JDB | 18 USC 231(a)(3) | 11 months' incarceration 36 months supervised release $2,000 restitution | 6 days intermittent confinement 24 months' probation $1,000 fine $2,000 restitution |
| White, Victoria, 1:21-CR-00563-JDB | 18 USC 231(a)(3) | 4 months' incarceration 36 months' supervised release $2,000 restitution | 8 days' intermittent confinement 3 months' home detention 24 months' probation |

| | | | |
|---|---|---|---|
| Hazelton, Stephanie, 1:21-CR-00030-JDB | 18 USC 231(a)(2) and (a)(3) | 11 months' incarceration 36 months' supervised release $2,000 restitution | 10 days' incarceration 90 days' home detention 24 months' supervised release $2,000 restitution |
| Cole, Benjamin, 1:23-CR-113-TNM | 18 USC 231 | 11 months' incarceration 36 months' supervised release $2,000 restitution | 14 days' intermittent confinement 48 months' probation 3 months' home detention 40 hours' community service $2,000 restitution |
| Johnson, Daryl, 1:21-CR-407-DLF | 18 USC 231(a)(3) | 3 months' incarceration 12 months' supervised release | 30 days' incarceration 12 months' supervised release $2,000 fine $2,000 restitution |
| Montoni, Corrine, 1:23-CR-00195-RCL | 18 USC 231(a)(3) | 3 months' incarceration 36 months' supervised release $2,000 restitution | 30 days' incarceration 24 months' supervised release $2,000 restitution |
| Konold, Cory, 1:21-CR-00160-TJK | 18 USC 231(a)(3) | 3 months' incarceration 36 months' supervised release $2,000 restitution | 30 days' incarceration 24 months supervised release $2,000 restitution |
| Konold, Felicia, 1:21-CR-00160-TJK | 18 USC 231(a)(3) | 6 months' incarceration 36 months' supervised release $2000 restitution | 45 days' incarceration 24 months supervised release $2,000 restitution |
| Grayson, Kenneth, 1:21-CR-00224-TSC | 18 USC 231(a)(3) | 3 months' incarceration 36 months' supervised release $2,000 restitution | 60 days' incarceration 24 months' supervised release $2,000 restitution |
| Sirr, Bernard, 1:22-CR-00259 | 18 USC 231(a)(3) 18 USC 1752(a)(1) 18 USC 1752 (a)(4) 40 USC 5104(e)(2)(D) 40 USC 5104(e)(2)(F) | 10 months' incarceration 36 months' supervised release $2,000 restitution | 2 months' incarceration 12 months' supervised release $2,000 restitution |
| Giberson, Larry, 1:23-CR-00115-CJN | 18 USC 231(a)(3) | 11 months' incarceration 36 months' supervised release $2,000 restitution $100 special assessment | 2 months' incarceration 6 months' home detention 6 months' supervised release $2,000 restitution $100 special assessment |

| Pavlik, Joseph, 1:23-CR-00045-TNM | 18 USC 231(a)(3) 18 U.S.C. § 1752(a)(1), (b)(1)(A) | 13 months' incarceration 36 months' supervised release $2,000 restitution | 60 days' incarceration 6 months' home detention 24 months' supervised release $6,000 fine $2,000 restitution |
| Stecher, Ezekiel, 1:21-CR-00720-RDM | 18 U.S.C. § 231(a)(3) | 90 days' incarceration 36 months' supervised release | 60 days' incarceration 24 months' supervised release $2,000 restitution |

Cases from the comparator table above involving the Lower West Terrace tunnel, like this case, include (1) *U.S. v. Preller*, 1:23-CR-00045; (2) *U.S. v. White*, 1:21-CR-00563-JDB; (3) *U.S. v. Hazelton*, 1:21-CR-00030-JDB; (4) *U.S. v. Cole*, 1:23-CR-113-TNM; (5) *U.S. v. Sirr*, 1:22-CR-00259-TNM; (6) *U.S. v. Giberson*, 1:23-CR-00115-CJN; (7) *U.S. v. Pavlik*, 1:23-CR-00045-TNM; and (8) *U.S. v. Stecher*, 1:21-CR-00720-RDM.

The Government argues two different comparator cases: *U.S. v. Rheiner*, 1:22-cr-00108-DLF and *United States v. Baugh*, 1:22-cr-00313-JEB, which we also address below – and establish that they are not in fact comparator cases at all.

This Court asked counsel to compare other 18 U.S.C. §231 cases in which it imposed sentences. There were two we located. First, *U.S. v. Price*, 1:22-cr-106-CJN, in which the government asked for 18 months of prison, followed by 36 months of supervised release and $2,000 in restitution; and the Court imposed 12 months and one day of prison, followed by 36 months of supervised release and $2,000 in restitution. *Price*, however, involved significant aggravating facts and factors not present in this matter. *Price* was not a tunnel case, but instead involved a Defendant who was involved in leading a group of Proud Boys (who had been involved in planning the activities on January 6, 2021) through the crowd towards a police line, who set out with the intention to cause physical interactions with police (and in fact did so). *See U.S. v. Price*, Doc. 42 (Govt. Sentencing Memo) at p.2. *Price* involved a Defendant who encouraged and led

others.  *Id.*  *Price* involved an effort by the Defendant and his co-conspirator New Jersey Proud Boys to physically impede and interfere with officers' efforts to arrest another suspect.  *Id.*  *Price* involved an offender who was proud of his actions – taking to social media to brag about his involvement.  *Id.*  Price involved a Defendant who threatened the lives of police officers.  *Id.* at p.7.  Adding insult to injury, *Price* involved a Defendant who repeatedly and flagrantly violated the terms of his pre-trial release, failing drug screens, committing new crimes, and lying to his pretrial Pre-Trial Services officer.  *Id.* at 16.  The Defendant in *Price* had four criminal history points, and a guidelines range of 12 to 18 months, and a Zone D guidelines range, calling for incarceration and no split sentence.  *Id.* at 3.

Unlike Mr. Price, Mr. Stover had no involvement with any militia groups (much less lead any such activity), did not lead anyone else, did not encourage interactions with police (and in fact asked others not to hurt the police), did not physically interfere with the arrest of others, did not take to social media to brag about his activities on January 6, 2021, and Mr. Stover, unlike Mr. Price, helped pull an officer up who had been knocked down.  Mr. Stover did not threaten police officers, and instead encouraged others not to hurt them.  Mr. Stover has fully complied with the terms and conditions of his pretrial release.  And Mr. Stover starts with a lower guideline range and a lower Zone.  Said another way, Price could not be more different.  In short, Price could not be more distinguishable.

The second was *U.S. v. Giberson*, 1:23-CR-00115-CJN.  In some ways, *Giberson* is similar to the present matter in that both involved a Defendant who was present in, and took place in activities therein, the Lower West Terrace tunnel, in which there were pushes against the police line.  *See U.S. v. Giberson*, 23-CR-00115-CJN at Doc. 26, Govt. Sentencing Memoranda.  Unlike Mr. Stover, "Giberson ushered additional rioters into the tunnel and towards the police line before

returning inside the tunnel, where he participated in coordinated pushing and pulling against the police." *Id.* at p.2. And unlike Mr. Stover, "Giberson eventually left the tunnel but remained on the Lower West Terrace, at one point chanting "drag them out!" as rioters continued to assault officers." *Id.* Giberson was involved in attempting to create a wall of police shields to push back against the police line. *Id.* at p.7. Giberson was involved in encouraging the efforts in the tunnel against the police line, shouting "another shield." *Id.* And Giberson was involved in ushering others into the tunnel to push against the police line, pushing at least 10 others into the tunnel for reinforcements for coordinated pushes against the police line. *Id.* at 8-9. As the Government explained it, "at a particularly violent moment near the mouth of the tunnel, as a rioter was using a pole to stab at the police line, Giberson called for more violence." *Id.* at 24. The Government also found significant the fact that Giberson had worked his way up to the front of the police line as an aggravating circumstance. *Id.* Giberson had a criminal history category of I, and a guidelines range of 8-14 months. *Id.* at p. 17. Giberson was sentenced to 2 months' incarceration, 6 months' home detention, 6 months' supervised release, $2,000 in restitution, and a $100 special assessment.

Unlike Mr. Giberson, Mr. Stover did not lead anyone else, did not encourage interactions with police (and in fact asked others not to hurt the police), and Mr. Stover, unlike Mr. Giberson, helped pull an vulnerable officer up and back to the police line who had been knocked down. Mr. Stover did not threaten police officers or encourage others to do so, and instead encouraged others not to hurt them. And Mr. Stover, unlike Mr. Giberson, never worked his way up to the front of the police line to interfere with officers. Mr. Stover's actions on January 6, 2021, are far less egregious than Mr. Giberson's, and call for a lower sentence.

Comparing sentences in other tunnel cases in the chart above also reveals that Mr. Stover's conduct compares favorably. First, in *U.S. v. Preller*, 1:23-CR-00045-TNM, the Defendant was

part of a militia group, encouraged others to break the police line, pushed against officers in the tunnel repeatedly, took credit and bragged on social media about his activities and desire to overthrow the federal government.  *See U.S. v. Preller*, 1:23-CR-00045 at Doc. 90 (Govt. Sentencing Memo).  He was sentenced to 60 months' supervised release, 40 hours' community service, and $2,000 restitution.

Next, *U.S. v. White*, 1:21-CR-00563-JDB.  There, the Defendant hoisted another person in the tunnel and cheered as he kicked officers.  *Id.* at Doc. 89, Govt. Sentencing Memo at 2.  She forced her way to the front of the line, where she participated in pushes against the line.  *Id.*  Like Mr. Stover, she attempted to mitigate some of the harm that day, preventing someone from smashing a window.  *Id.* at 5.  Once inside the tunnel, she made her way to the front to interact with the police line and then "White pushed against the walls, the officers, and their shields, another officer used a baton to get her to stop."  *Id.* at 12.  "Due to her insistence on entering the area, and refusal to turn around and leave, officers ultimately had to physically pull White through the to the other side, into the building itself."  *Id.* at 13.  White then took to social media to paint herself in a favorable light for her actions on January 6.  *Id.* at 14-15.  And in interviews with law enforcement, she indicated she did nothing wrong.  *Id.* at 15-16.  White then violated the terms of her release.  *Id.* at 19-20.  And White had a higher criminal history than Mr. Stover.  She was sentenced to 8 days' intermittent confinement, 3 months' home detention, and 24 months' probation.

Next, *U.S. v. Hazelton*, 1:21-CR-00030-JDB.  There, the Defendant shouted and urged the crowd forward to combat police, with words like "This is battle. This is it. This is the battle," and "More men," like a commander on a battlefield.  *Id.* at Doc. 56, Govt. Sentencing Memo at 1.  She further shouted: "Let's go! Move forward! They cannot stop us all!"  *Id.* at 2.  And the following

day she was pleased with herself, writing "Yeah I was at [the] door the entire time from 1 to 6 and we did not make it in! That was a set up. . . . The first shot has been fired of the revolution." *Id.* She did all of this in coordination with the Sons of Liberty, a militia group who was intent on overthrowing the government. *Id.* at 3. Evidence suggested an advance intention by Hazelton to storm the Capitol and prevent the certification of President Biden as early as late December, 2020. *Id.* at 11-12. Then, on January 11, 2021, she messaged, "I just need a couple days of recovery and we will [b]e back at it!!" *Id.* Between January 14 and 20, 2021, Hazelton indicated she was taking steps to cover up any evidence of her crime. *Id.* On January 14, 2021, she messaged, "Trying to get all the pictures off my phone into an internal hard drive." *Id.* And on January 20, 2021, she messaged, "Erase anything that lends anything to what is being said. . . . We can do damage control later." *Id.* She was sentenced to 10 days' incarceration, 90 days' home detention, 24 months' supervised release, and $2,000 restitution.

Next, *U.S. v. Cole*, 1:23-CR-113-TNM. The Defendant in Cole was also part of a militia group, the Guardians of Freedom. *Id.* at Doc. 82, Govt. Sentencing Memo at 2. After participating in multiple pushes against law enforcement lines in the tunnel, Cole then taunted the FBI on Facebook. *Id.* at 7-8. Cole also carried a weapon – an expandable baton. *Id.* at 10. Cole was sentenced to 14 days' intermittent confinement, 48 months' probation, 3 months' home detention, 40 hours' community service, and $2,000 restitution.

Next, *U.S. v. Sirr*, 1:22-CR-00259-TNM. Sirr made his way to the front of the line several times and participated in coordinated pushes against the law enforcement officer line. *Id.* at Doc. 53, Govt. Sentencing Memo at 2. He then stopped to film a violent assault on a law enforcement officer. *Id.* And he then made his way back into the tunnel. *Id.* He could be heard telling the others to push back. *Id.* at 11. Sirr made posts to social media in advance of January 6, 2021, with

posts like the "noose tightening" around traitors' necks, Patriots fighting. *Id.* at 12-14. Sirr was sentenced to 2 months' incarceration, 12 months' supervised release, and $2,000 restitution.

Next, *U.S. v. Pavlik*, 1:23-CR-00045-TNM. In *Preller*, the Defendant was part of a militia group, wore tactical vest armor, led the militia group to the tunnel, was the first member of his militia group to push against police in the tunnel, took out a canister of pepper spray to use against officers and attempted to do so, had the can jostled from his hand, and he then handed the can to another individual who used the can against officers. *See U.S. v. Pavlik*, 1:23-CR-00045 at Doc. 116 (Govt. Sentencing Memo) at 2. He was active on social media leading up to January 6, 2021, in fomenting violence. *Id.* at 3-4. He continued his rhetoric about overthrowing the government after January 6, 2021 – unrepentant. *Id.* at 10-11. He was sentenced to 60 days' incarceration, 6 months' home detention, 24 months' supervised release, a $6,000 fine, and $2,000 restitution.

And, finally, *U.S. v. Stecher*, 1:21-CR-00720-RDM. Stecher repeatedly entered the tunnel, went to the front of the police line, directly by the doors, was sprayed, and then went out and encouraged others by shouting "If we can't push them, drag 'em!" *Id.* at Doc. 57, Govt. Sentencing Memo at 12. He was sentenced to 60 days' incarceration, 24 months' supervised release, and $2,000 restitution.

Unlike the foregoing tunnel Defendants, Mr. Stover had no involvement with any militia groups, did not lead anyone else, did not encourage interactions with police (and in fact asked others not to hurt the police), and Mr. Stover, unlike all of the other Defendants, helped pull an officer up who had been knocked down. Mr. Stover did not threaten police officers, and instead encouraged others not to hurt them. Mr. Stover has fully complied with the terms and conditions of his pretrial release. Those facts distinguish Mr. Stover's actions, and call for a lower sentence than the comparators above.

The Government's proposed comparators are not comparators at all.  (Govt. Memo. at 31-33).  First, *U.S. v. Rheiner*, 1:22-cr-00108-DLF.[11]  Rheiner was actively involved in leading the efforts at the West Plaza tunnel, yelling at rioters to "push up" on the police as he led the crowd against the police line.  *See U.S. v. Rheiner*, Sentencing Memo at Doc. 34 at p.2.  Rheiner grabbed a riot shield from the officer, and then pulled on it and dragged a police officer down the stairs. *Id.* at 2, 9.  Rheiner then entered the Capitol, into the Old Senate Chamber, yelled at officers "you're going to get pushed back eventually" and then made contact with an officer.  *Id.* at 2-3, 14.  After his arrest on January 6, Rheiner was then arrested again on state charges.  The Government argued that Rheiner's behavior was particularly troubling because:

> Rheiner's behavior is particularly troubling because he: (1) advanced to the front of the crowd of rioters directly confronting the police on the Upper West Terrace; (2) encouraged others to "push up" on the police line there; (3) ripped a riot shield out of an officer's hands and apparently took it into the crowd of rioters (4) in so doing, pulled the officer down stairs, causing the officer to fall to the ground; (5) then illegally entered the Capitol building; and (6) joined other rioters in aggressively trying to intimidate police officers near the Rotunda; (7) stood so close to those police officers that he touched them with his body and hand.  *Id.* at 20.

Mr. Rheiner's criminal history was equally troubling, with felony convictions for theft, indecent exposure, several burglary convictions, and multiple assault charges that were dropped. *Id.* at 20-21.  Mr. Rheiner was on probation for another offence on the day he participated in the events on January 6.  He had a criminal history of IV, and a 18-24 month sentencing guideline range.  The Government asked for 21 months of incarceration, and the Court imposed 15 months, with 36 months supervised release and $2,000 in restitution.

Unlike Rheiner, however, Mr. Stover did not grab an officer's riot shield from an officer, or drag an officer down steps knocking him down, did not encourage others to engage in activities

---

[11] There is now pending a motion to reduce that sentence due to application of Amendment 821 to the U.S. Sentencing Guidelines.  See *U.S. v. Rheiner*, 1:22-cr-00108-DLF at Doc. 51.

at the West Terrace tunnel or lead efforts there, and did not enter the Capitol to engage in further physical interactions with police.  Rheiner is not a comparator at all.

The next comparator offered by the Government is *U.S. v. Baugh*, 1:22-cr-00313-JEB.  In that case, Baugh traveled with another individual, Mazza, who was armed with a .45 caliber handgun, and both traveled to the terrace.  *Id.* at Doc. 17, Govt. Sentencing Memo.  Baugh then assisted and followed Mazza, who had taken a baton and had beaten an officer with it.  *Id.* at 16.  Baugh participated in multiple heave ho efforts in the tunnel, and shouted "heave ho."  *Id.* at 18.  And Baugh stayed at the Capitol until well into the evening.  *Id.* at 19.  When confronted, Baugh then lied to law enforcement following his activities on January 6.  *Id*. at 2-3, 20.  Baugh was sentenced to 12 months and one day, two years supervised release, and $2,000 in restitution.

Unlike Baugh, Mr. Stover did not travel with or participate in activities with anyone who brought a firearm to the Capitol, did not assist anyone who had taken a baton and beat an officer, did not stay at the Capitol well into the evening, and did not lie to law enforcement about his involvement.  And unlike Baugh, Mr. Stover helped pull an officer up who had been knocked down. Mr. Stover did not threaten police officers, and instead encouraged others not to hurt them. In short, Baugh is not a comparator.

### C.  The Government's Sentencing Memorandum and Sentencing Recommendation is Not in Conformity with the Statutory Sentencing Factors.

A cursory review of the Government's Sentencing Memorandum and Sentencing Recommendation (Doc. 129) reveals that it is not in conformity with the statutory sentencing factors and appears to be based on certain misstatements. In a blatant failure to evaluate the § 3553 factors, the Government devotes a mere two paragraphs of its 35-page sentencing memorandum to Mr. Stover's "history and characteristics."   And when it does so, it does so in a

misleading manor, suggesting to the Court that it should take into account not only the two misdemeanors in the last decade, but also very aged and stale traffic offenses that occurred more than a decade ago in its sentencing consideration.  Clearly, Mr. Stover, as a person, matters very little to the Government and, in the mind of the Government, he is just another insurrectionist, even though he never even went into the Capitol on January 6.  After the Court informed the parties that it had a high interest in other 18 U.S.C. §231 cases, the Government chose two that are blatantly distinguishable, as described above.

While the Government has a compelling obligation to prosecute those involved in the events of January 6, 2021, in doing so, it cannot lose its perspective and forget its obligations to be just, fair, and consistent during the process.[12] In its sentencing memorandum, the Government makes no mention, let alone, acknowledgement that Mr. Stover:

---

[12] As Mr. Stover never entered the Capitol to stop the certification of the election, he is not an insurrectionist or invader. Allowing the Government to seek one and a quarter years of incarceration for charges of impeding or resisting law enforcement during a protest creates a dangerous precedent for other protest-related resistance where no physical injury occurs. Regardless of the political ideology, the purpose of the protests, or those involved, this country has recently seen very violent encounters with law enforcement that have often gone unpunished to the level in this case. See, e.g., https://www.forbes.com/sites/anafaguy/2023/11/16/6-cops-and-90-protesters-injured-outside-dnc-in-clashes-over-israel-hamas-war-police-and-protestgroup-say/?sh=6cfbb1265a4a , last visited April 29, 2024 (describing six Capitol Police officers assaulted and injured in response to pro-Hamas protests outside the Democratic National Committee headquarters while Congressional members were inside on November 16, 2023); https://www.jpost.com/international/article-771751, last visited April 29, 2024 (describing an assault outside the White House, which required White House staffers to relocate); https://www.kiro7.com/news/local/thousands-gather-capitol-hill-solidarity-withdemonstrations-portland/STVDEK5XUJHWLL2HQZT2NWDYVY/, last visited April 29, 2024 (identifying 55 officers injured after protests turned violent with trailers set on fire, windows at businesses smashed, cars damaged, and explosive devices thrown at police); U.S.S.S. Press Release, https://www.secretservice.gov/newsroom/releases/2020/05/secretservice-statement-pennsylvania-avenue-demonstrations-0, last visited April 29, 2024 ("More than 60 Secret Service Uniformed Division Officers and Special Agents sustained multiple injuries from projectiles such as bricks, rocks, bottles, fireworks and other items. Secret Service personnel were also directly physically assaulted as they were kicked, punched, and exposed to bodily fluids. A total of 11 injured employees were transported to a local

• Never entered the U.S. Capitol or tried to do so;
• Intervened in the assault on Officer Fanone and pulled him to safety and the police line;
• Did not punch or kick a law enforcement officer, have a weapon in his possession, or attempt to use any object as a weapon;
• self-surrendered in Kentucky after being notified of the warrant;
• has been 100% compliant with his supervision requirements for the last year;
• has not been involved in any drugs or contacts with the criminal justice system since his arrest in this case; and
• has maintained steady employment.

Apparently to the Government, none of this matters. Rather, Mr. Stover automatically deserves a mid-point guideline range.

**D.  Sentencing Request and Recommendation.**

A term of supervision is determined by reviewing many of the same § 3553(a) factors already considered above, including, as are relevant here: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for deterrence, to protect the public, and provide treatment to the defendant; (iii) the available sentences and sentencing range; (iv) relevant policy statements by the Sentencing Commission; and (v) the need to avoid sentencing disparities. *See* 18 U.S.C. § 3583(c). Accounting for these factors, as addressed above, Mr. Stover recommends (1) a three-year period of supervision including the "standard" conditions recommended by the Guidelines. *See* USSG § 5D1.3(c); (2) $2,000 in restitution as agreed to in the plea agreement; and (3) 90 days of home incarceration, which will impose a significant liberty restriction on Mr. Stover while also permitting him to maintain his

---

hospital and treated for non-life threatening injuries.");
https://www.nbcwashington.com/news/local/protesters-gather-in-dc-for-2nd-day-inresponse-to-george-floyds-death/2317512/, last visited April 29, 2024 (detailing eleven MPD officers injured in one single evening);
https://majorcitieschiefs.com/wpcontent/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf , last visited April 29, 2024 (identifying at least 2000 injured offices nationwide from contributing data from police associations — excluding Washington, DC, which withheld data — from May 25, 2020 through July 31, 2020 from protests).

employment to support his wife and children.  If the Court believes that confinement is also

necessary, intermittent confinement can be imposed as part of the sentence (we submit that it

should be 14 days or less in conformity with comparator cases – though Mr. Stover's actions in

assisting Officer Fanone seems to warrant more favorable treatment than the 6 days of

intermittent confinement in *White*).  As can community service.  That recommendation is

consistent with other comparable West Terrace Tunnel cases, and specifically (1) *U.S. v. Preller*,

1:23-CR-00045; (2) *U.S. v. White*, 1:21-CR-00563-JDB; (3) *U.S. v. Hazelton*, 1:21-CR-00030-

JDB; and (4) *U.S. v. Cole*, 1:23-CR-113-TNM.

The conditions of supervised release will significantly restrict Mr. Stover's liberty and

provide a daily reminder of his criminal conduct by requiring that he, among other things:

- regularly report to his probation officer;
- seek permission from the Court or his probation officer to leave Kentucky;
- respond truthfully to questioning by his probation officer;
- live in an approved residence and notify his probation officer of any address change;
- allow his probation officer access to his residence;
- work fulltime and notify his probation officer of any job change;
- refrain from knowingly communicating with criminals;
- notify his probation officer if he is arrested;
- refrain from possessing a firearm or other dangerous weapons; and
- refrain from possessing illegal drugs or alcohol.

A three-year period of supervision, subject to these conditions, will provide adequate

punishment and deterrence while allowing Mr. Stover to remain a productive member of

society. A ninety-day period of home detention would also act as a deterrence for any future

conduct similar to the offense conduct in this case.[13]

---

[13] Regarding restitution and assessments, as set forth in the PSR, Mr. Stover does not have
the ability to pay a fine in addition to the mandatory restitution in this case. This Court
should not impose a fine because neither Mr. Stover generate significant income beyond that
required to pay the necessities of life for Mr. Stover and his three dependents (his wife and
two children).

## III.    CONCLUSION

For the foregoing reasons and others that may appear to the Court or may develop at the sentencing hearing, Mr. Stover respectfully requests that this Court impose a sentence of three years of supervision, with a period of home confinement, in addition to the mandatory restitution of $2,000 to the Architect of the Capitol.

Respectfully Submitted,

/s/Christopher Wiest_____
Christopher Wiest (KY 90725)
Chris Wiest, Attorney at Law, PLLC
50 E. Rivercenter Blvd, Ste. 1280
Covington, KY 41011
513-257-1895 (v)
859-495-0803 (f)
chris@cwiestlaw.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon all Counsel of record, via CM/ECF, this 30th day of April, 2024.

/s/Christopher Wiest_____
Christopher Wiest (DCD 0002)