## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-237 (CJN)** |
| **NATHAN EARL HUGHES,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nathan Earl Hughes to 51 months of incarceration, three years of supervised release, a fine, and a special assessment of $210. A 51-month sentence, which is at the high end of the defendant's guidelines range, reflects his planning for violence in advance of coming to Washington on January 6, 2021, the seriousness of his violent conduct at the Capitol, his protracted efforts to obstruct the investigation and evade prosecution, and his continued refusal to accept responsibility or express any remorse about his conduct.

### I.    INTRODUCTION

The defendant, Nathan Earl Hughes, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million

1

dollars in losses.[1]

  Hughes, a business owner from Arkansas, joined the riot at the United States Capitol. On January 6, Hughes attended the then-president's rally at the Ellipse, then he changed outfits and travelled to the Capitol in a golf cart. Hughes entered the restricted area around the Capitol grounds around 2:15 p.m. through the Peace Circle on Pennsylvania Avenue NW. Despite clear signals that he was not permitted to be in the area—including other individuals walking away from the Capitol telling him that rioters had breached the building, police vehicles with their sirens running, overturned and scattered barricades, and chemical irritants hanging in the hair—Hughes maneuvered his way through the crowd. He climbed over walls and up balustrades to the Lower West Terrace and eventually made his way to the mouth of the Lower West Terrace tunnel. When Hughes arrived at the mouth of the tunnel, rioters had been assaulting police officers there *en masse* for thirty minutes. Hughes called "C'mon!" to other rioters behind him and beckoned them into the tunnel before running in himself. Hughes joined the group's synchronized pushes against police officers in the tunnel. He called out to other rioters to take the officers' riot shields and assisted other rioters in passing those shields back out of the tunnel to other members of the mob. As Hughes was being pushed from the tunnel, he attempted to wrestle protective equipment from a police officer's hands. Hughes then struck that officer with his elbow and his fist before Hughes

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

was expelled from the tunnel. The officer, who had been knocked off balance by Hughes' assaults, was then pulled into the mob. Hughes remained on the Lower West Terrace for hours and, throughout the afternoon, called for rioters to pull officers from the tunnel and encouraged other rioters to enter the building through a smashed window. When Hughes realized that he was likely to be prosecuted for his conduct at the riot, he obstructed the investigation by lying to the FBI, deleting his social media accounts that contained digital evidence, and hiding physical evidence. Since entering a plea in this case, he has made public statements that contradicted the statements he swore to in his plea hearing and has expressed pride his conduct at the Capitol. For these reasons, the government recommends that the Court sentence Hughes to 51 months of incarceration.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 56-1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.    Hughes' Role in the January 6, 2021, Attack on the Capitol

<u>Hughes' Pre-January 6 Activities</u>

In the run up to and months following the 2020 presidential election, Hughes was arming himself and preparing for violence and chaos following the election by acquiring supplies, including weapons and body armor. Hughes' remaining public statements from that time indicated that at least some of these items were intended for use in Washington. In response to a public tweet

speculating about what to do in the event of a "comms blackout" in Washington, Hughes tweeted an Amazon.com link to shortwave radios on December 29, 2020. Between October 29, 2020, and December 28, 2020, he spent several thousand dollars at sporting goods stores, gun stores, and tactical gear outlets. Among Hughes' purchases were two transactions from AR500, which is an online store that sells plate carriers designed to be concealed underneath clothing to protect against gunfire.[2] Nine days before the riot at the Capitol, on December 28, 2020, Hughes made a $1,814 purchase at a firearms store in nearby West Virginia. In addition to making numerous firearms and body armor purchases, Hughes was travelling extensively across the United States for events connected to the 2020 election. These events included a November 2020 political rally about the 2020 election in Washington, D.C.,[3] a December 2020 rally in Georgia hosted by the then-president,[4] and a December 2020 protest of the results of the 2020 election in Washington, D.C.[5]

On January 4, 2021, Hughes travelled from his home in Bentonville, Arkansas, to Washington, D.C. Hughes was in contact with several organizers of various events that were taking place in Washington, D.C., on and around January 6, 2021, that related to the 2020 election. Some

---

[2] Although AR500 now sells other protective items, by using the Internet Archive to see the website as it appeared in November and December 2020, the government has determined that at that time it only sold body armor, plate carriers, protective plates, and some branded apparel. On November 19, 2020, Hughes made a $413.21 purchase from AR500, which—four years later—is the approximate amount that it costs to purchase a concealed plate carrier with two metal plates from the site, $447.00.

[3] *See* Marissa J. Lang et al., *After thousands of Trump supporters rally in D.C., violence erupts after night falls*, WASHINGTON POST, November 15, 2020.

[4] *See President Trump Campaigns for U.S. Senate Runoffs in Georgia*, C-SPAN, December 5, 2020, available at https://www.c-span.org/video/?506972-1/president-trump-campaigns-us-senate-runoffs-georgia (Hughes, wearing sunglasses, a backwards red hat, and a red tee-shirt over a gray sweatshirt, is visible in the front row of the rally from timestamp 3:05-3:22)

[5] *See* Emily Davies et al., *Multiple people stabbed after thousands gather for pro-Trump demonstrations in Washington,* WASHINGTON POST, December 12, 2020.

of these contacts included affiliates of Alex Jones, a well-known media personality and conspiracy theorist. While he was *en route* to D.C., Hughes replied "See you soon brother!" to a tweet from an associate stating that he was in Washington to "fight fir [*sic*] our Republic!"

<u>Early Morning Activities and Approach to the Capitol</u>

On the morning of January 6, Hughes attended the "Stop the Steal" rally. Hughes arrived early in the morning for the rally and was standing immediately on the opposite side of the security perimeter around the stage at the Ellipse. Hughes tweeted a picture of his view from the rally. *See* Figure 1.



*Figure 1. Posted to Twitter early in the morning on January 6, 2021.*

Hughes was present for the then-president's speech. While at the rally, Hughes wore a red hat, brown sunglasses, Mechanix brand gloves, and a red tee-shirt over a gray hooded sweatshirt. *See* Figure 2.

5



*Figure 2a. Hughes at the "Stop the Steal" rally.*

After the rally ended, at 2:10 p.m., Hughes posted a tweet that referred to the violence then

taking place at the Capitol. *See* Figure 3.



*Figure 3. Posted to Twitter in the afternoon on January 6, 2021.*

At some point between when the rally ended and approximately 2:15 p.m., Hughes changed

outfits into a black and camouflage hat with a frayed brim and a black Infowars shirt with an image

of a space shuttle, which he wore over a gray hooded sweatshirt. Hughes also tied a red bandana

around his neck, which covered the lower half of his face for the duration of his time at the Capitol. Hughes continued wearing what appeared to be the same Mechanix brand gloves and gray sweatshirt that he had worn at the rally. *See* Figure 3b.



*Figure 2b. Hughes at the mouth of the Lower West Terrace tunnel after his outfit change.*

Hughes rode to the Capitol with Jon Thomas Mott[6] and others in a golf cart caravan. The golf carts weaved through the crowd, down Pennsylvania Avenue toward the Capitol. *See* Gov. Ex. 219 at 2:09-2:33; *see also* Figure 4. While these two golf carts were making their approach to the Capitol, the sound of police sirens and emergency vehicles resounded across Pennsylvania Avenue. While passing the United States District Courthouse, they drove by a police car that had been boxed in by rioters such that it was unable to move in any direction despite having its siren and lights on.

---

[6] Jon Thomas Mott pled guilty in November 2022 to a misdemeanor offense in connection with his conduct at the Capitol. *See United States v. Mott*, 21-cr-464 (RCL).



*Figure 4. The golf cart drives past the intersection of Third Street NW and Pennsylvania Avenue as Hughes leans out to looks toward the Capitol. Hughes is marked with a red arrow.*

As they drove to the Capitol, Mott, who was standing immediately behind Hughes in the golf cart, described events that were taking place at the Capitol to the crowd, such as, "We're inside; we've breached the Capitol." On their final approach to the Capitol down Pennsylvania Avenue towards the Peace Circle, someone leaned over to the golf cart that Hughes was in and informed them, "they knocked over the fences." Hughes and the others in the golf cart continued their approach to the building, eventually stopping at an area near the Grant Monument on the West Front of the United States Capitol.

<u>Hughes' Ascent to the Lower West Terrace</u>

Hughes entered the restricted perimeter at approximately 2:15 p.m. Between approximately 2:30 p.m. and 3:15 p.m., Hughes forced his way through, up, and over the crowd that had amassed on the West Front of the Capitol. During this time, he listened to a speech that one of the people with whom he rode in the golf cart gave to the crowd through a megaphone: "Are we ready to take

back our republic? Are we ready to tell these people that want fraud that we will not take it anymore? To let them know that if they don't do the will of the people, then they will be replaced? Let's take it back now! This our republic! 1776! [Inaudible.] This is our moment!". Hughes cheered and threw his fist up in support while listening. *See* Gov. Ex. 213 at 0:26-0:51; *see also* Figures 5a & 5b.



*Figure 5a. Hughes is indicated with a red  arrow.*    *Figure 5b. Hughes raising a fist in support.*

Hughes then climbed onto a wall that had been built as part of the stage for the upcoming inauguration. As he climbed up onto the wall, Hughes' shirt was drawn tight over his torso, which revealed what appeared to be the outline of body armor underneath Hughes' clothing. *See* Gov. Ex. 214 at 0:50-0:57; see also Figures 6a & 6b.



*Figure 6a.*                    *Figure 6b. Body armor profile*
                               *outlined in red.*

On the wall, Hughes weaved through the crowd that had stalled on the steps and before he

ascended up to the balustrade on the northwest side of the inaugural stage. As he entered the area

known as the Lower West Terrace, Hughes stopped to look out over the crowd. *See* Figure 7.



*Figure 7.*

10

<u>Hughes Violent Conduct in the Lower West Terrace Tunnel</u>

By approximately 3:15 p.m., Hughes pushed his way through the crowd to the mouth of the Lower West Terrace Tunnel. Before entering the tunnel, Hughes urged the crowd around him to enter, yelling "C'mon! C'mon! C'mon!" while waving his gloved hand in the direction of the tunnel. Immediately after signaling to the crowd to enter the tunnel, Hughes charged inside and towards the line of police officers blocking the rioters from entering the Capitol. *See* Gov. Ex. 203 at 0:24-0:29; *see also* Figure 8.



*Figure 8.*

Inside of the tunnel, as he began pushing on the backs of other rioters, Hughes continued to signal to rioters outside of the tunnel to enter and confront the police line within the tunnel. As other rioters followed him into the tunnel, Hughes began pushing against the backs of other rioters, which increased the total force that officers at the far end of the tunnel had to resist against. At 3:17 p.m., Hughes' bandana fell, briefly revealing his face. *See* Figure 9.

11



*Figure 9.*

At approximately 3:18 p.m., rioters at the front of the mob forcefully grabbed and stole riot shields being used by officers to protect themselves against the mob's assaults against them. Hughes participated in and aided this conduct. Singling out an officer in front of him who was resisting the rioters with his shield, Hughes called out to rioters who were closer to the officer to "grab his shield" and pointed towards the officer. See Gov. Ex. 203 at 2:20-2:25. When rioters stole shields from the officers and passed them back, Hughes joined in helping pass those shields back out of the tunnel and to the mob on the Lower West Terrace. *See id.* at 2:40-2:50; *see also* Gov. Ex. 101 at 29:00-29:10; *see also* Figures 10a & 10b. Hughes also personally grabbed an officer's shield and tried to pry it from his hands. *See* Gov. Ex. 101 at 29:10-29:15; *see also* Figure 10c.



*Figure 10a.*



*Figure 10b.*



*Figure 10c.*

At the same time, approximately 3:18 p.m., officers began a slow advance towards the mouth of the tunnel, trying to clear out the mob. *See* Gov. Ex. 101 at 29:20-29:30. USCP Officer M.M. was at the front of the police line and was wearing an MPD riot helmet and holding a baton and riot shield. As Officer M.M. pushed forward, one rioter grabbed hold of his shield and alternatively attempted to pull it away from him and push against it to prevent Officer M.M.'s advance, while multiple other rioters made physical contact with Officer M.M. *Id.* at 29:29-29:40 Hughes then grabbed Officer M.M.'s baton and began pulling him by the baton, on which Officer M.M. maintained a grip. *Id.* at 29:40-29:59; *see also* Figure 11. Hughes' conduct knocked Officer M.M. off-balance and opened him up to further assaults from additional rioters as he tried to clear them from the tunnel.



*Figure 11.*

As he was being assaulted by multiple rioters, Officer M.M. continued his push to clear rioters from the tunnel. Just before 3:19 p.m., Hughes grabbed at Officer M.M. for a second time and attempted to pull him forward out of the tunnel. *See* Gov. Ex. 101 at 29:54-30:00; *see also* Figure 12.



*Figure 12.*
15

Seconds later, Hughes was about to be pushed out of the mouth of the tunnel by the advancing officers. Hughes struck Officer M.M. with his elbow once and then with his fist twice in a hammer-style punch. *See* Gov. Ex. 101 at 29:59-30:05; *see also* Figure 13.



*Figure 13.*

Immediately after Hughes assaulted him, Officer M.M. was pulled from the tunnel and assaulted by the mob on the Lower West Terrace before he was pulled out of the tunnel by other rioters. *See* Gov. Ex. 101 at 30:05-31:30; see also Gov. Ex. 202 at 4:30-5:11.[7] Hughes ran back up the steps towards the windows near the tunnel as Officer M.M. and a second officer were violently accosted by the mob on the Lower West Terrace after being pulled from the tunnel. *Id.*; *see also* Figure 14.

---

[7] Gov. Ex. 202 was filmed with a GoPro camera that had 360° recording capabilities. To view Hughes and the scene that unfolded after Officer M.M. was pulled from the tunnel, the perspective of the camera may need to be adjusted. This can be accomplished by click-and-dragging on the video image.



*Figure 14. Hughes, with his back turned, is marked with a red circle. Officer M.M. (center) is marked with a blue circle; the other officer (right) is also marked with a blue circle.*

Hughes was ejected from the tunnel by police at approximately 3:19 p.m. But he remained on the Lower West Terrace until after 5:00 p.m. During this time, he joined chants to "pull the cops out" from the tunnel. *See* Gov. Ex. 209 at 0:08-1:07. At 3:45 p.m., rioters tried to smash the windows to an interior Senate office near the tunnel, and some people in the crowd tried to stop them. Hughes responded by assaulting and restraining the people who were trying to stop the destruction, thereby giving his support to those who were trying to break the window. *See* Gov. Sent. Ex. A at 0:00-0:30. The rioters then succeeded in smashing the windows open. When the windows were finally breached, Hughes cheered and again used his hand to signal the crowd forward and encouraged rioters to climb through the windows and breach the building through the new entry point. See Gov. Ex. 210 at 0:00-0:24. During this entire time, Hughes watched other rioters assault police and encouraged his fellow rioters while they did so. Hughes did not leave the Lower West Terrace until a tactical police unit arrived and cleared rioters out.

Hughes' Statements After the Riot

After the riot, Hughes celebrated the riot on Twitter and Facebook, and called for more violence:



*Figure 13a. Posted to Twitter in the evening on January 6, 2021.*



*Figure 13b. Posted to Twitter in the evening on January 6, 2021.*



*Figure 13c. Posted to Twitter in the afternoon on January 7, 2021.*

18



*Figure 13d. Posted to Twitter on January 7, 2021.*

### C.    Hughes' Obstructive Conduct

Hughes made repeated efforts to obstruct the investigation of his conduct at the Capitol by deleting, destroying, or hiding both digital and physical evidence, and by lying to the FBI.

In early January 2021, the FBI received several tips that Hughes had participated in the violence at the Capitol. On January 26, 2021, the FBI interviewed Hughes in response to these tips. Hughes told the interviewing agents that he did not enter the Capitol. Shortly after the interview ended, Hughes called an acquaintance he knew worked for the FBI as a Task Force Officer (TFO). Hughes, after specifically seeking out this TFO, lied to him and said that he went to Washington, D.C. for the rally but did not go to the Capitol. Hughes told the TFO that he left after the speech because "things were going crazy."

In August 2021, a media outlet and a Twitter account publicly identified Hughes as a

participant in the violence at the Capitol. As discussed above, Hughes was very active on social media and posted numerous times about his trip to, plans for, and conduct in Washington, D.C. However, by the time that the FBI began re-examining the case against Hughes in the fall of 2021, they discovered that all of Hughes' social media profiles had been deleted or were otherwise inaccessible. Certain social media posts, some of which were captured by the FBI prior to Hughes deleting his accounts and are included *infra*, related to Hughes' plans to travel to Washington, D.C., his intent in going there, his willingness to use physical violence, and self-authored summaries of his conduct on January 6. By deleting his social media accounts, Hughes thus deleted a trove of evidence about his conduct at the Capitol.

Hughes also destroyed or attempted to obscure physical evidence which would have incriminated him in this case. Specifically, on the day of Hughes's August 30, 2023, arrest, the FBI thoroughly searched his residence pursuant to a lawfully issued search warrant. During the search, the FBI did not locate the clothes that Hughes wore to the Capitol, which had been described in the August 2021 public reporting about Hughes' conduct at the Capitol. But the FBI did locate the clothes he wore to the rally in the morning, which had not, to the government's knowledge, been described in public reporting about Hughes. Then in November 2023, the FBI received a tip from one of Hughes's family members that, after being publicly identified, Hughes began hiding items that he thought the FBI might be looking for or that could get him in trouble. Hughes asked members of his family, including the tipster, to hold certain items for him while he was keeping a low profile and facing a potential federal case for his participation in the riot. The family member additionally reported to the FBI that Hughes asked other individuals to hold some of his personal items while he was at risk of being arrested. The family member then provided a

backpack to the FBI that Hughes had had given to them which contained, among other things, drugs, drug paraphernalia, and a receipt from the Old Ebbitt Grill in Washington, D.C. The receipt was dated from December 2020, during the time Hughes was in Washington.

### D.    Hughes' Eleventh-Hour Plea

Hughes' case was scheduled for a bench trial on August 6, 2024. On July 30, 2024, Hughes' counsel informed the government that Hughes intended to plead guilty to Counts One, Two, and Five of the third superseding indictment without a plea agreement and that any trial would be isolated to Counts Three and Four.[8] Despite his counsel's communication with the government and the Court about his intent to plead guilty, on August 4, 2024, Hughes posted the below to Twitter:



*Figure 14. Posted to Twitter on Sunday, August 4, 2024, at 11:35am.*

---

[8] Based on this representation, the government informed the Court and Hughes' counsel that it did not intend to try only Counts Three and Four and that, if Hughes pled guilty on August 6, 2024, the government would move to dismiss these counts after sentencing.

In light of the late notice of his intent to plea, lack of a plea agreement, and Hughes' own public statements indicating an intent to proceed to trial ("[m]y *trial starts* this week"), the government prepared for trial on August 6 and informed the Court of its intent to try this case in the event that Hughes did not enter a plea.

### E.    Hughes' Post-Plea Statement and Activities

Even after entering his plea, Hughes has been increasingly active on social media. Using his Twitter handle, @RallyNate, he has repeatedly trumpeted falsehoods and conspiracies about January 6 that are intended to evade responsibility.[9]  In late October and early November, Hughes tweeted the personal information of a person whom he assessed to be a "deranged leftist" who allegedly trespassed on his property. Hughes tweeted this person's name, political party affiliation, and family members' information. As a result of Hughes' conduct, this person was subjected to a series of harassing conduct and threats. Hughes has also used Twitter to identify people whom he alleges were involved with identifying him and thus leading to him facing criminal charges for his conduct. On November 17, 2024, in response to someone on Twitter saying that Hughes assaulted police at the Capitol, Hughes tweeted, "Read the statement of facts. I NEVER assaulted police officers." On November 21, 2024, he tweeted—in violation of the protective order in this case— the name and shield number of an officer with whom he interacted at the tunnel; Hughes lied about the nature of the interaction. He then suggested that the police officers who committed suicide in the wake of January 6 had been murdered by the government or some other entity as part of a

---

[9]  In his interview with the Probation Office, Hughes denied having any social media other than a Facebook. PSR ¶ 85. This was a lie. Hughes is prolific on Twitter and also has an Instagram account under the handle @naffan12.

coverup by saying that officers were "suicided" to "silence" them as "potential whistleblowers." On December 2, 2024, Hughes responded to someone Twitter telling him that he had to make "better choices" in reference to his conduct at the Capitol by saying that he "was on a sightseeing tour and [his] guide got lost."

Hughes has also appeared on Alex Jones' show since entering his plea. Shortly before the November 2024 presidential election, Hughes appeared on the show and continued spreading some of the misinformation about fraud that gave rise to the events of January 6. In this appearance, he stated, "We're almost going through a replay of 2020, which—I don't know if I am allowed to say that, but I am gonna be honest in, you know, I guess a time of crisis." *See* Gov. Sent. Ex. B a 5:34-5:48. When the host told him that he could say "whatever the hell he wants" on the show, Hughes responded, "Good! No, 100%. Just my lawyers might not like that, but I really don't give a damn anymore." *Id.* at 5:51-5:57. On November 22, 2024, Hughes appeared on Alex Jones' internet show again. During this thirty-minute interview, Hughes discussed the charges against him. Hughes minimized his conduct and contradicted his sworn statements at the plea hearing. Describing the conduct that led to him being criminal charged he stated, "So, J6 was wild. The big thing that I am in trouble for over J6 is there was a riot shield that was passed over the head of a person in front of me and I passed it behind me. Now I am convicted of felony civil disorder and felony impeding police and blocking the entrance to a Capitol." *See* Gov. Sent Ex. C at 1:12:05-1:12:21. Hughes reiterated many of the lies he has said on Twitter about his conduct at the Capitol. At one point during the interview, they displayed a photo showing Hughes running into the tunnel on January 6.[10] Once this image was displayed for the audience, Hughes went, "Yep! There we

---

[10]  The photo shown is Figure 4 from the statement of facts in this case. *See* ECF 1-1 at 5.

go. There is the action shot!" *Id.* at 1:12:30-1:12:50

## III.    ARREST, CHARGES, AND PLEA

Hughes was arrested on a criminal complaint on August 30, 2023. On September 13, 2023, Hughes was indicted as the fifth codefendant in *United States v. Johnston, et al.*, 23-cr-237 (CJN). On June 27, 2024, a federal grand jury returned a third superseding indictment charging Hughes and his four codefendants with five counts, including, 18 U.S.C. § 231(a)(3) (civil disorder), 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers), 18 U.S.C. § 1752(a)(1) (entering or remaining in a restricted building or grounds), 18 U.S.C. § 1752(a)(2) (disorderly conduct in a restricted building or grounds), 40 U.S.C. § 5104(e)(2)(E) (obstructing or impeding passage through or within Capitol grounds). On, August 6, 2024, Hughes pled guilty to Counts One Two, and Five of the third superseding indictment.

## IV.    STATUTORY PENALTIES

Hughes now faces sentencing on Counts One, Two, and Five of the third superseding indictment. Hughes faces up to five years of incarceration on Count One, up to eight years of incarceration one Count Two, and up to six months of incarceration on Count Five. The statutory maximum terms of supervised release and fines are, respectively, set forth in ¶¶ 139-140 and ¶¶ 156-157.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Guidelines analysis is as follows:

**Count One:** 18 U.S.C. § 231(a)(3), Interfering with Law Enforcement Officials During a Civil Disorder.

Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, we use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
|---|---|---|
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1) – If the offense involved physical contact, […] increase by 3 levels.<br><br>Hughes made physical contact with USCP Officer M.M. |
| Cross-Reference: | | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)."<br><br>The Application Notes to Section 2A2.2 define "aggravated assault" as a "felonious assault that involved … (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; … or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt n. 1.<br><br>Hughes's conduct constituted aggravated assault because it was a felonious assault that involved the intent to commit another felony (Civil Disorder). U.S.S.G. § 2A2.2, cmt. n.1. Therefore, the cross-reference to U.S.S.G. §2A2.2 applies.<br><br>The Guidelines do not define "assault" or "felonious assault." Sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an |

| | | |
|---|---|---|
| | | apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (defendant assaulted a police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), |
| Base Offense Level | 14 | U.S.S.G. §2A2.2 |
| Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> Officer M.M. was in uniform, wearing riot gear, and easily identifiable as a police officer. Hughes' assault on Officer M.M. were motivated by the fact that Officer M.M. was performing his duties as a police officer by protecting the Capitol from the mob of rioters, including Hughes. |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." <br><br> Hughes attempted to obstruct the FBI's investigation into this case. He destroyed digital evidence by deleting his social media profiles that are known to have contained substantial evidence of his planning for violence and his after the fact statements about his conduct at the Capitol. He lied during his initial interview with the FBI and then sought out another individual who he knew to be working for the FBI and lied to that individual as well. He also destroyed, hide, or otherwise obscured physical evidence, including by asking various family members and friends to |

26

|  |  | hold on to his personal property to prevent the FBI from finding it. |
|---|---|---|
| **Total** | **22** |  |

**Count Two: 18 USC § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (USCP Officer M.M.)**

| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
|---|---|---|
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1) – If the offense involved physical contact, […] increase by 3 levels.<br><br>Hughes made physical contact with USCP Officer M.M. |
| Cross-Reference: |  | U.S.S.G. §2A2.4(c) – the relevant conduct here is assault, so we apply §2A2.2. *Sargent*, 103 F.4th at 827-828; *see also Stevens*, 105 F.4th at 480.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>Hughes's conduct was aggravated assault because was committed with the intent to commit another felony, namely, to obstruct an officer during a civil disorder in violation of 18 U.S.C. § 231(a)(3). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>*See discussion for Count One, above.* |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the |

| | | |
|---|---|---|
| | | obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." *See discussion for Count One, above.* |
| **Total** | **22** | |

## Count Five: 40 U.S.C. § 5104(e)(2)(E) – Impeding Passage in a Capitol Building

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

The PSR accurately calculates the Guidelines for Count Two, but it does not calculate the Guidelines for the remainder of the counts of conviction. *See* PSR ¶¶ 57-65. The government agrees that the Total Offense Level in this case is 22.

<u>U.S.S.G. § 4C1.1 Does Not Apply</u>

Amendments to the Sentencing Guidelines for 2023 include U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Among those criteria is that the offense not involve violence. Hughes' assault against Office M.M. in the Lower West Terrace tunnel involved violence, as did his synchronized pushing efforts against other officers in the tunnel. Hughes called others into the tunnel and then eagerly joined in the groups synchronized pushing against police officers. When officers resisted the rioters with their shields, Hughes called out for others to rip the officers' riot shields from them and also personally tried to pull an officer's shield out of his grip. Hughes also used violence in his assault against Officer M.M., pulling him off balance by grabbing at his baton and shield and, when this effort to disarm Officer M.M. failed, striking him three times. Hughes first struck Officer M.M. with his elbow and then, once Officer M.M. had buckled under the first blow, two subsequent hammer-punches with his fists. Hughes' assaults also

led to Officer M.M. being pulled from the mouth of the tunnel and accosted by the crowd on the Lower West Terrace. Hughes engaged in this course of action during a deadly riot. Since his specific offense involved violence and was set within the context of a violent riot, § 4C1.1 does not apply.

Acceptance of Responsibility

The government agrees with the Probation Office that Hughes is not entitled to an adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. *See* PSR ¶¶ 47-49. Hughes made an eleventh-hour decision to plead guilty without a plea agreement one week before trial. Even after his counsel informed the government that he intended to plead guilty, Hughes was still publicly telegraphing his intent to take his case to trial. *See* Figure 14. The government was spared no resources and fully prepared this case for trial and was, in fact, prepared to begin trial on the day that the defendant entered his plea. Therefore, the government is not moving for any reduction under U.S.S.G. § 3E1.1(b).

Additionally, Hughes is not entitled to any reduction under U.S.S.G. § 3E1.1(a). As described above, Hughes went to substantial lengths to obstruct the investigation of this case. This course of conduct began on January 6 itself, when he changed outfits after the rally and obscured his face for nearly the entire time he was at the Capitol. In January of 2021, Hughes misled interviewing agents by minimizing his conduct in Washington. After this first interview, Hughes then specifically sought out an FBI TFO to lie to him about his conduct at the Capitol by claiming that he did not go to the Capitol. He also destroyed evidence by deleting his social media profiles that, based on the posts that has obtained, contained evidence about intent, planning, and conduct for the offenses on the indictment. Based on the FBI's investigation, he also obscured or otherwise

tried to hide evidence of his conduct by asking friends and family to hold on to items that he felt may be incriminating or that could potentially get him in trouble if they were found during a search. This conduct is sufficient for an upward adjustment under U.S.S.S. § 3C1.1.

Conduct resulting in an obstruction of justice adjustment can co-exist with acceptance of responsibility "in extraordinary cases." U.S.S.G. § 3E1.1 cmt n.4. This is not such an extraordinary case. Less than two days before his trial was set to begin and *after* his counsel has informed the Court and the government that Hughes intended to plea, Hughes publicly announced that he was travelling to Washington for a *trial* not for a plea. *See* Figure 14. When Hughes was interviewed by the Probation Office, the Probation Officer noted that "other than stating he accepted responsibility for his actions in the offense, no further verbal or written statement was provided." PSR ¶ 47. At every step of this case since, Hughes has indicated that he has not accepted responsibility for his conduct. Insofar as his plea itself should be considered any sort of an expression of remorse, the Court should view it extremely skeptically in light of Hughes' conduct surrounding the entry of his plea, his efforts to obstruct the investigation, and his post-plea conduct, including his statements on the Alex Jones internet show denying the same facts he admitted in his sworn guilty plea and his apparent revelry about his conduct on that show. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Absent a clear expression of remorse or regret and considering his

obstructive conduct, the circumstances of Hughes' case fall far below the extraordinary circumstances required under U.S.S.G. § 3E1.1, n.4 for obstruction and acceptance adjustments to coexist. Therefore, Hughes is thus not entitled to any reduction for acceptance of responsibility.

Grouping Analysis

The government agrees with the grouping analysis in the PSR. *See* PSR ¶ 56. Under U.S.S.G. § 3D1.2, "closely related counts" group. Because the victim of both of Hughes' offenses of conviction was Officer M.M., they form a single "group." U.S.S.G. § 3D1.2(a) and (b).

Criminal History & Final Offense Level

The U.S. Probation Office calculated the Hughes' criminal history as category I, which is not disputed. PSR ¶ 68. Accordingly, based on the government's calculation of the total adjusted offense level, including an adjustment for obstruction of justice, at 22, Hughes' Guidelines imprisonment range is 41 to 51 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Hughes' felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Evidence strongly suggests that Hughes prepared for violence ahead of his travels to Washington, including by purchasing body worn armor in the preceding weeks and then appearing to wear it to the Capitol. During the riot, he joined the melee in the

Lower West Terrace tunnel, encouraged others to do the same, participated in pulling shields away from police officers, pushed against officers with the mob in the tunnel, and—when he was about to be pushed from the tunnel—elbowed and punched Officer M.M. After Officer M.M. was pulled from the tunnel and violently assaulted by the crowd along with another officer, Hughes ran away from the immediate scene of their assaults but remained on the Lower West Terrace for almost another two hours. Hughes, knowing that this was a violent riot and having witnessed firsthand some of the worst singular instances of violence that occurred on the Lower West Terrace on January 6, cheered on the rioters by encouraging them to "pull the cops out" and, although he did not go in himself, urged other rioters to enter the Capitol building through a broken window. The nature and circumstances of Hughes' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 51 months' incarceration.

### B.  The History and Characteristics of the Defendant

Hughes' crimes on January 6 were not an isolated incident in an otherwise law-abiding life. In 2011, Hughes was convicted of criminal contempt in Benton County, Arkansas. *Id.* ¶ 67. He has been arrested two other times for violent conduct, including domestic battery. *Id.* at ¶¶ 73-74**.** Hughes is, however, also an intelligent and charismatic person who was accepted to the United States Military Academy at West Point and who has made a comfortable living for himself through numerous business ventures. *Id.* at ¶¶ 80, 110. Despite these laudable attributes, Hughes chose to join a violent riot to accomplish his political ends. Hughes went to the Capitol knowing that doing so was unlawful, as evidenced by his outfit change and care to obscure his face with a bandana. Moreover, the evidence suggests that he prepared for violence at the Capitol by wearing body armor underneath his clothing. This conduct, taken together with his conviction for criminal

contempt and arrests for violent conduct, are evidence of someone who is both willing to engage in violence and intelligent enough to carefully plan his crimes to maximize their effectiveness and minimize his risk of being identified and held accountable.

Hughes' efforts to obstruct the investigation also speak volumes about who he is. Early in the investigation, he misled the FBI multiple times when it became clear to him that his violence at the Capitol could lead to him facing criminal consequences. Extraordinarily, one of these instances involved him affirmatively seeking out an FBI TFO so that he could lie to that TFO about his conduct at the Capitol. Hughes also destroyed evidence in this case when he deleted his boastful social media posts and the accounts containing them. In addition to showing his intent and summarizing his conduct, the social media posts that the government was able to recover show that he is someone who was extremely proud of his conduct at the Capitol and reveled in the violence that day. And based on the description from his family member about his hiding incriminating items and asking other people to hold on to items that he did not want the government to find, it appears Hughes's efforts to obstruct the investigation continued for years and may still be continuing.

Hughes has carefully separated his out-of-court conduct from his in-court persona. In court, he has represented himself to be respectful, contrite, and understanding of the seriousness of these proceedings. But on Twitter and Alex Jones' show, he has been precisely the opposite: disrespectful, bombastic, and completely remorseless. The Court should consider this important duality and view any expressions of remorse or contrition that he may make at sentencing with dubiety. Hughes' history and characteristics show that he is someone who not only engaged in violence but goes to great lengths to cover his trail and evade consequences and who is still proud

of his conduct. This factor weighs heavily in favor of a 51-month term of incarceration.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Hughes' criminal conduct on January 6 was the epitome of disrespect for the law. See *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D. The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Hughes' conduct on January 6 shows that he is someone who is clearly in need of specific deterrence. Hughes knew that there was riot happening at the Capitol yet went there anyway. In fact, Hughes' conduct up to that point shows

---

[11] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

that he was ready for violence and that his intent in going to the Capitol was specifically to engage in violence. Hughes went so far as to call the mob forward into the tunnel and rallied them to take the officers' shields. When he was about to be pushed from the tunnel, Hughes repeatedly struck Officer M.M. in a final effort to remain in the tunnel. Still, though, Hughes was undeterred and he spent nearly two more hours on the Lower West Terrace calling for additional violence, witnessing police being assaulted, and encouraging rioters to breach the Capitol. Hughes even assaulted and restrained individuals who he believed to be interfering with the rioters' efforts to smash the windows of the Capitol building.

Ultimately, it was only the arrival of a tactical police team armed with long guns and deploying substantial crowd control munitions that drove Hughes from the Lower West Terrace. Now, although Hughes has entered a plea and made a conclusory statement to the Probation Office that he accepts responsibility for his actions, his social media and other public statements after January 6 and even after his guilty plea were those of a man who was both proud of his violent conduct, *see* Figure 13a, and someone who was girding for another battle, *see* Figures 13b & c. Hughes' conduct on January 6, his after the fact statements, considered together with his efforts to obstruct this case and continuing statements wherein he minimizes or outright denies the conduct that he swore to as part of his plea, demonstrate that the Court's sentence must be sufficient to provide specific deterrence from committing future crimes of political violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means

that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[13] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[12] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[13] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Some of the most important comparators for Hughes' conduct are his four codefendants, all of whom have now been sentenced by this Court in this case: Jay James Johnston (sentenced to 12 months and a day), Kyle Kumer (sentenced to 10 months incarceration), Alan St. Onge (sentenced to 18 months incarceration), and William Stover (sentenced to six months incarceration). *See* 23-cr-237 (CJN). But Hughes' conduct is miles worse than all his codefendants. None of the codefendants were charged with or convicted of assault as Hughes has been. All the codefendants engaged in synchronized pushing with the crowd against the police, but none of them struck a particular officer, much less three times as Hughes did. Although Stover did wear a protective vest that is commonly used in paintball, none of them prepared for violence like Hughes. Like Kumer, though, Hughes did call out to the crowd and encourage them in their efforts against police. Johnston did use a stolen police riot shield to form a "shield wall" against the police, but he did not participate in forcibly taking shields from officers and passing them back to the crowd, much less wrestling with a specific officer for his protective gear. Similarly, none of the codefendants attempted to obscure their identities at the Capitol, while Hughes did, and none of them participated in the obstructive conduct that Hughes did. Hughes' codefendants each had aggravating factors in their cases that the Court appropriately considered in crafting its sentences for them; Hughes' conduct, however, has the aggravating factors of each of his codefendants and then some. In short, Hughes' conduct was far more serious than all his codefendants and the Court's sentence should be appropriately more severe.

In addition to his codefendants' cases, comparison to the case of *United States v. Lucas Denney*, 22-cr-70 (RDM), is instructive. Like Hughes, Denney spent the weeks leading up to January 6 gathering weapons. Denney, like Hughes, also wore body armor on January 6. Also like

Hughes, Denney approached the Lower West Terrace through the amassed rioters on the West Front of the Capitol, but, unlike Hughes, Denney assaulted and interfered with additional officers as he approached the tunnel, including by spraying some officers with chemical irritants. Once he arrived at the tunnel, Denney, like Hughes, joined the pushing against the police line and pushed against a police officer's shield inside of the tunnel. Denney, also like Hughes, swung at a police officer who had been separated from the crowd, but Denney only swung once as opposed to Hughes who struck Officer M.M. three times in the span of a few seconds. Denney, like Hughes, spent a considerable amount of time in the restricted perimeter. Finally, Denney, like Hughes also obstructed the investigation by lying to the FBI and deleting his social media accounts. Judge Moss sentenced Denney to 52 months incarceration.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The

MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[14]

---

[14] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Hughes to pay $2,000 in restitution for his convictions on Counts One, Two, and Five. This amount fairly reflects his role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  FINE

Hughes' convictions under 18 U.S.C. §§ 231 and 111 subject him to a statutory maximum fine of $250,000 for each count. *See* 18 U.S.C. § 3571(b)(3). His conviction under 40 U.S.C. Section 5104 subjects him to a maximum fine of $5,000. *See* 18 U.S.C. § 3571(b)(6). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).

The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994). Here, Hughes has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). With an offense level of 22, the guidelines fine range here is $7,5000 to $75,000. U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. The PSR notes that Hughes has more than $1,000,000 in assets, including $85,000 in personal cash assets and $338,000 in business cash assets. PSR ¶ 110. He also has assets in the form of real property, moveable goods, and the reported value of his

various businesses. *Id.* Based on his liquidity and positive cash flow, the Probation Office concluded that he does have the ability to pay a fine. PSR ¶ 131.

However, the PSR also notes that Hughes has Give Send Go where he has raised over $67,000 in an online campaign created by his fiancée. PSR ¶ 119. As of this filing, Hughes has raised $67,967. The request for donations, a portion of which was purportedly written by the Hughes,[15] references his charges and arrest, and describes him as an "American Patriot." Notably, even after informing the government and the Court that he intended to enter a plea, Hughes made another solicitation for donations claiming that he was imminently going to go to trial and needed money to cover his trial expenses. This post resulted in him receiving more than $1,000 in donations in a forty-eight-hour period. Hughes has repeatedly used his Twitter account to ask for donations to help with his criminal case despite his substantial assets. This conduct suggests that Hughes is seeking donations not to pay for his legal expenses but instead to profit from his crimes. For these reasons, a fine of $67,967 is appropriate in this case.

---

[15] "I can't talk about the case (it's from the January 6th 2021 [*sic*] at the Capitol), but I can say there are many things out there that paint me as violent anti-American domestic terrorist…and I am wholeheartedly NOT that. I've got a long legal journey ahead now and will face this head on and post updates. Thank y'all for your support."   *See* "Support American Patriot Nathan Hughes," available at givesendgo.com/nathanhughes/ (last visited December 6, 2024).

## IX. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 51 months of incarceration, three years of supervised release, $2,000 in restitution, a fine of $67,967, and a $210 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov