UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v. ) | Case No. 23-cr-237 CJN |
| ) | |
| NATHAN EARL HUGHES ) | |
| ) | |
| ) | |
| Defendant ) | |
| ) | |

**DEFENDANT NATHAN HUGHES SENTENCING STATEMENT**

> William L. Shipley
> PO Box 745
> Kailua, Hawaii 96734
> Tel: (808) 228-1341
> Email: 808Shipleylaw@gmail.com
> *Attorney for Defendant*

I. <u>Introduction</u>

Comes now Defendant Nathan Hughes by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on December 16, 2024.

Defendant Hughes appears for sentencing before this Court having plead guilty to:

Count One, a violation of 18 U.S.C. Sec. 231(a)(3) - Civil Disorder;

Count Two, a violation of 18 U.S.C. Sec 111(a)(1) Resisting, Impeding, etc., Officers, and;

Count Five of 40 U.S.C. 5104(e)(2)(E) Violent Entry and Disorderly Conduct on the Capital Grounds, of the Indictment.

II. <u>Objections to the Offense Conduct As Stated in the PSR:</u>

There is no plea agreement between the parties. The factual basis for the pleas of guilty to Counts One, Two, and Five were based on a factual statement drafted by Defendant Hughes and submitted to the Court prior to the change of plea taking place.

The Offense Conduct Section of the PSR largely mirrors the factual allegations set forth in the Affidavit supporting the Application for a Criminal Complaint.

To the extent that factual basis in support of the guilty pleas is consistent with the Offense Conduct set forth in the PSR, Defendant Hughes has no objection. But, the Offense Count described in Par. 30 of the PSR is not

part of the factual basis that was admitted to by Defendant Hughes during the change of plea hearing, and he denies the allegations set forth in Par. 30.

Paragraph 30 reads as follows:

> 30. Seconds later, as defendant Hughes was about to be pushed out of the mouth of the tunnel by the advancing officers, defendant Hughes struck Officer M.M. with his elbow once and then with his fist twice in a hammer-style punch. Immediately after defendant Hughes assaulted him, Officer M.M. was pulled from the tunnel and assaulted by the mob on the Lower West Terrace before he was pulled out from the mob by other rioters.

As stated in Par. 30, the PSR claims that Defendant Hughes "assaulted" Officer M.M. Defendant Hughes did not admit to "assaulting" Officer M.M., and Sec. 111(a) covers a broad range of conduct that does not include "assault." Defendant Hughes denies that he "assaulted" Officer M.M. and objects to the inclusion of this unproven fact in the Offense Conduct.

Defendant Hughes plead guilty to the violation of 18 U.S.C. Sec. 111, but the factual basis for his guilty plea to that count, as set forth in Defendant's August 5, 2024 letter to the Court Docketed at ECF No. 175, stated the facts relating to the Sec. 111 charge as, "At 3:18 p.m., Hughes assisted others in passing an MPD shield away from the police line, over the top of the heads of other individuals in the crowd. As police were regaining control of the tunnel and pushing unauthorized individuals out, Hughes forcibly grabbed a shield held by Capitol Police Officer M.M. Hughes was pushed out of the tunnel at approximately 3:19 p.m." *Id.* at Pg. 2. Defendant Hughes further admitted "… he knowingly committed an act with the intended purpose of obstructing, impeding, and interfering with one or more law enforcement officers through this course of conduct on January 6, 2021…". *Id.*

As noted, the PSR's claim in this regard mirrors the allegations of the Criminal Complaint Affidavit. The allegations of the Criminal Complaint Affidavit in this regard are also repeated by the Government in its Sentencing Statement. As is often the case in prosecutions arising out of the events of January 6, the conclusions asserted by the Government reflect the most extreme characterization of objective video evidence, with exaggerations stretching nearly to the point of mischaracterization of what the evidence actually shows. This is often the result of using still images taken from the video that seem to capture a key moment, but which are then belied when the video itself is is closely examined as a sequence of such images.

Defendant's Exhibit 1 shows the 40-second sequence of events during which the PSR and Government contend Mr. Hughes "assaulted" Officer M.M. The video clearly shows Defendant Hughes grabbing the shield – which he admitted. But the video also shows that Defendant Hughes' hands were on the police shield during the entirety of the time during which the Government alleges Defendant Hughes used his hand(s) to strick Officer M.M. Obviously, Defendant Hughes does not have a third hand used to strike Officer M.M. as alleged by the Government. What the video shows – which is not easily discerned from the still images – is that the individual to Defendant Hughes' left struck is the person who struck Officer M.M. in the face. Even though the Government has the burden at sentencing to establish contested factual issues by a preponderance of the evidence, Defendant Hughes intends to play this video in slow motion at the Sentencing Hearing to establish he was not the individual who assaulted Officer M.M. as alleged in the Offense Conduct.

4

III.  Defendant's Guideline Calculation:  Counts One and Two: "Civil Disorder" and "Interfering, Impeding, etc. Officers."

The PSR correctly concludes that the applicable Sentencing Guideline for a violation of Sec. 231 is U.S.S.G. Sec. 2A2.4.  The PSR the mistakenly applies the Cross-Reference directing that Sec. 2A2.2 be used in cases involving "aggravated assault."  Based on the unsupported claim that Mr. Hughes "assaulted" an officer, the PSR concludes that Sec. 2A2.2 is applicable to both Counts One and Two, and includes a Sentencing Guideline calculation using that Section.

Since there was no "assault" on Officer M.M, and because the definition of "aggravated assault" as set forth in the Sentencing Guidelines requires first the existence of a "felonious assault" plus other conduct (Application Note 1, Sec. 2A2.2), there is no basis under the facts here to apply the cross-reference for either Counts One or Two.  As noted in the PSR, Count One has no specific guideline set forth in the Statutory Index set forth in Appendix A.  Count Two is indexed to both Sections 2A2.2 and 2A2.4.  But Sec. 2A2.2 specifically applies to offenses involving "assaulting" an Officer.  Because there was no "assault" in this case, the applicable guideline for both Counts One and Two is Sec. 2A2.4.

| | |
|---|---:|
| Base Offense Level: | 10 |
|     Physical Contact with an Officer | +3 |
|     Adjustment for Acceptance | -2 |
| **Total Offense Level:** | **11** |

Based on a Total Offense Level of 11, a Criminal History Category of I, the Recommended Guideline Range is 8-14 months.

Other Objections to the PSR Guideline Calculation:

IV.   Other Objections to the Guideline Calculation in the PSR.

   a. Acceptance of Responsibility

The PSR does not recommend a reduction for acceptance of responsibility notwithstanding the fact that Mr. Hughes pled guilty to three of the five counts in the indictment in which he was charged, with the two other counts alleging violations of Sec. 1752 – the circumstances of which are well understood by all parties.  The Government stated in advance of the change of plea hearing that, even in the absence of a plea agreement, it would dismiss Counts Three and Four if the defendant enters guilty pleas to the Counts One, Two and Five as anticipated.

The PSR does not provide a rationale for the failure to recommend a reduction for acceptance of responsibility, but does point to the recommendation for a +2 level enhancement for "obstruction" under Sec. 3C1.1 involving alleged conduct that could weigh against "acceptance of responsibility."  The PSR acknowledges that both Sec. 3C1.1 and 3E1.1 can both apply, and left the matter for the Court to determine.

   b. Obstruction of Justice

The allegedly "obstructive conduct" is set forth in Paragraphs 35-38 of the PSR.  But the allegations do not provide specifics as to when the investigation of Hughes began or, more importantly, when Hughes knew he was under investigation and then acted in a manner "purposely calculated, and

6

likely, to thwart the investigation and prosecution…".   Application Note 1 to Sec. 3C1.1.

Paragraph 35 refers to Hughes telling the FBI he did not "enter" or "go into" the Capitol on January 6.  The issue here is one that reaches a level of near comedy – whether going "into" the Lower West Terrace tunnel, past the arched entrance, is "entering" the Capitol.  The tunnel begins with an open archway without doors, followed by an enclosed walk of about 25 feet with concrete walls on both sides, to a set of locking doors with clear glass. Approximately ten feet beyond the locked doors is a second set of doors with opaque glass that have no locking mechanism. Behind those doors is a USCP station with a magnetometer device for screening entrants. The Offense Conduct shows that Mr. Hughes passed the arched entrance of the tunnel but made it almost no farther as the crowd was blocked by the police officers inside.

Whether "entering the Capitol" includes going beyond the archway at the opening of the tunnel, but never passing through the two sets of doors into a hallway entrance to the Capitol proper, is a game of semantics.  It is not evidence of "obstruction" in the form of making false statements to the FBI while under investigation.

Paragraph 36 refers to Hughes having deleted material from social media accounts about himself and his actions on January 6.  But the PSR does not include any factual allegation that the deletion of that material was done in response to the existence of an FBI investigation. In fact, the PSR doesn't even note when the FBI investigation of Hughes began, when Hughes first became

7

aware that he was under investigation, or when the deletions are believed to have occurred. This brings into consideration the language quoted above from Application Note 1 with regard to alleged conduct taking place prior to the start of an investigation. It is not enough that the conduct may have been obstructive, it must have been taken with the purposeful intent to "*likely ... thwart*" the investigation. That means the conduct must have likely to do more than simply hinder an investigation not yet begun, it must be of a kind and nature that would make such an investigation likely impossible to conduct.

    Paragraph 37 says that Hughes "appears" to have destroyed or attempted to destroy physical evidence. The "appearance" is based on the fact that 32 months after January 6, 2021, during a search of his residence on August 30, 2023, the FBI did not find all the items of clothing it was searching for. There is no information – not even a stated supposition – that the absence of such items was the result of conduct to hinder or thwart the investigation. There is no information about when –- if at all – the items were disposed of. The only fact known for certain is that the items were not in the location the FBI searched. That is insufficient information from which to draw any conclusions. The missing items could simply have been elsewhere on that day, but the FBI lacked probable cause to search that alternative location.

    As an aside, it is also worth noting inaccurate factual assumptions that were set forth in the Search Warrant Affidavit, which was the subject of a motion to suppress in this case. One of the items sought was a specific baseball-style cap that, from photographs, appeared to be well-worn and weathered in a fashion that the Government suggested it was an item the

8

defendant had held onto for a long period of time. This claim supported the proposition that the warrant was not stale, as items being searched for likely had some sentimental value and were of the type that Mr. Hughes likely continued to hold onto even 32 months after having worn it on January 6. The Government then noted for the Court in the opposition that it did, in fact, find the hat in question.

The problem with that unfounded claim is the FBI did not, in fact, find the hat in question. What the FBI found was another hat of the exact same model as the one he wore on January 6, 2021. That particular hat is manufactured in such a way as to give it the appearance of being "worn" and "weathered" as an aesthetic. Mr. Hughes' business involves manufacturing and selling such logo'd promotional items through conservative media and websites. Mr. Hughes had dozens of copies of that same hat in boxes that were not searched, just as he had boxes of other kinds of logo'd collectibles such as tee-shirts.

So, no conclusions about "obstruction" can be drawn with respect to the failure by the FBI to find any particular evidence or items of clothing when it searched Mr. Hughes residence more than two and one-half years after the fact.

Paragraph 38 sets forth information alleged to have been provided by an unnamed relative of Mr. Hughes in November 2023 – two months after he was charged and arrested, and his house was searched. These allegations – which Mr. Hughes cannot rebut without knowing the source -- is that Mr. Hughes enlisted the help of family members to hide items while he "kept a low profile."

9

The family member claims he was given a backpack to hold while Mr. Hughes thought he was "at risk of being arrested." But the contents of the backpack had nothing to do with January 6 – not even the receipt from Old Ebbits Grill, as that was dated in December 2021. The PSR curiously omits the specific date on the receipt – Mr. Hughes attended the "Jericho Rally" in Washington D.C. on December 14, 2021, conduct that is unrelated to the events of January 6, 2021.

The +2 enhancement for "obstruction is not supported as claimed by the PSR, and as a result Mr. Hughes is entitled to the -2 adjustment for "acceptance of responsibility."

V.    Sentencing Factors Under Sec. 3553(a)

Pursuant to 18 U.S.C. § 3553(a), certain numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to the Defendants background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

    1.    Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.

       a. <u>The Nature and Circumstances of the Offense</u>.

For the most part the actions of the Defendant's on January 6 are not in dispute. As many Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol with the intent to engage in violence for the purpose of disrupting the Congress's certification of the 2020 Electoral Vote count for the purpose of interfering with the peaceful transfer of Presidential power between Administrations.

2) a larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with regard to the outcome of the election, but with no predetermined intention of engaging in violence. Some in this second group were drawn into acts of violence once at the Capitol as a result of what they observed and the way events unfolded; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

This Court has recognized that individuals whose participation involved being part of the "heave-ho" efforts against the mass of police officers in the tunnel are in a category that is distinct from other defendants who engaged in shocking acts of violence directly targeting officers seeking to defend the Capitol and prevent the crowd from entering. Mr. Hughes was one of the individuals who went into the tunnel and joined others in the "heave-ho" effort against the mass of officers.

Mr. Hughes did, at one point, reach the front line of the Officers, but he did not engage in any shocking act of violence targeted at any one officer. He did grab the baton of an officer to prevent it from being used against him. He was also involved in a group effort to pass a police shield back and over the top of the crowd to the outside of the tunnel. Mr. Hughes. The time period of Mr.

Hughes participation came in the moments just prior to the law enforcement officers gaining the "upper hand" and successfully pushing the protesters, including Mr. Hughes, past the arched entrance to the tunnel.

      b. <u>History and Personal Characteristics</u>.

Mr. Hughes was born on August 7, 1989, in Arkansas to Paul Hughes and Debbie Hughes, both of whom reside in Bentonville, Arkansas. Mr. Hughes has one brother, Corey Coggin (age 45), who Mr. Hughes does not have any contact with.

Mr. Hughes had a generally positive upbringing in northwest Arkansas. He was an active child, participating in sports and enjoying time outdoors. However, in 2008, the Hughes family faced financial hardship after the defendant's father lost his business and filed for bankruptcy following the economic downturn, resulting in a period of financial struggle for the family.

Despite these challenges, Mr. Hughes excelled academically. He graduated from high school with a 3.5 GPA and was accepted to attend the prestigious United States Military Academy at West Point. However, in June 2008, just two weeks before his scheduled enrollment, Mr. Hughes was involved in a severe boating accident in Canada. The accident left him with significant injuries, including having his right arm nearly severed completely near his shoulder.  He also suffered extensive damage to the muscles in his right leg. He spent an entire year recovering from these injuries, including undergoing numerous surgical procedures to repair them.  But, heartbreakingly, even though he was given the opportunity to enroll in West

Point the following year, he was unable to pass the basic physical fitness examination required of all Cadets for admission.

Mr. Hughes maintains close, supportive relationships with his family. They have been an important source of emotional support throughout his life.

Mr. Hughes has never been married but now, as of November 4, has a newborn child, with his long-time girlfriend – now fiancé -- of eight-years, Taylor Haddock.

Since 2014 Mr. Hughes has owned and operated his own successful e-commerce business, Diamond Hands, LLC, the primary business of which is printing custom tee-shirts for local businesses. After producing the tee-shirts, he handles the shipping and ensures the products reach their intended destinations. He also provides logo'd promotional materials for some conservative websites and media outlets.

Mr. Hughes employs approximately 25 people who assist with various aspects of the business. His work requires some travel, as he and his team regularly attend trade shows where they promote and sell their products, further extending the reach of Diamond Hands, LLC.

> 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

Among the considerations required by Sec. 3553(a) is that the Court seek to avoid unwarranted sentencing disparities. Here the defendant had four co-defendants. In addition, there are numerous other individuals who have been

13

convicted of violations of Sections 111(a) and 231 on substantially similar facts.

Among other cases involving similar charges, this Court sentenced the defendant to 27 months in custody in *United States v. Phipps*, 21-cr-44-CJN. Defendant *Phipps*, like Hughes plead guilty without a plea agreement to a violation of 18 U.S.C. Sec 111(a) and 18 U.S.C. Sec 231(a)(3). Unlike Hughes, *Phipps* had several contacts with police officers during his time at the Capitol including entering and remaining inside the building. *Phipps* entered the Capitol at 2:58 p.m. and was pushed out. *Phipps* then reentered at 3:01 p.m. and exited the building at 3:32 p.m. Roughly an hour later *Phipps* had an encounter with officers 4:35 p.m. and made physical contact with three officers.

Similar to Defendant Hughes here, *Phipps*' guilty plea to the 18 U.S.C. 111(a) reserved the right to argue that his contact with the law enforcement officers was not an "assault" but a less significant violation of Sec. 111(a) involving interfering, obstructing, etc., the officers on the Upper West Terrace while they were attempting to clear the remaining protesters who had been pushed out of the building. The video evidenced showed an officer forcefully pushing the individual standing next to Mr. Phipps in a "cross-check" fashion with his baton, and Mr. Phipps reacting by grabbing the baton and pushing it back into the officer. The Court determined that, while a close call, Mr. Phipps conduct did involve more than merely interfering with the officer's efforts, and that pushing back into the officer did satisfy the definition of "assault" under Sec. 111(a).

This Court sentenced Phipps to 27-months, but noted that one reason for the length of sentence was the fact that while Phipps' Criminal History Category was I, and he had 0 criminal history points, he had an extremely lengthy history of contacts with law enforcement, including multiple instances of contempt for failing to follow court directions or attend court proceedings as ordered. This Court described *Phipps* lengthy history of contacts with law enforcement – nearly his entire adult life -- as reflecting a continuing and longstanding "disrespect for the criminal justice system," culminating with his actions on January 6, but for which *Phipps* never received any meaningful form of punishment i.e., any prior sentence of incarceration to coerce him into obeying the law in the future.

No such consideration is relevant to Mr. Hughes here.

In *United States v. Portlock*, 22-cr-00067 (CJN), this Court sentenced the defendant to 20 months in custody. *Portlock* involved actions that were unquestionably an aggressive assault by the defendant and a second individual who used a large piece of plywood against officers on the West Front. Later Portlock joined in the "heave-ho" pushing inside the Tunnel, same as Mr. Hughes. Clearly, Mr. Portlock's conduct was significantly more extensive, and involved violence directed at specific officers.

In *United States v. Brackley*, 24-cr-0009 (CJN), this Court sentenced the defendant to 15 months. *Brackley* crossed numerous barriers and police lines on his way to entering the Capitol. Once inside *Brackley* went to multiple locations before being stopped by two officers as he approached the Senate

15

Chambers. He then led other protesters in pushing through the officers attempting to block their path using his arms and elbows.

The PSR sets forth the sentences given to co-defendants in this case. While the facts as applied to those co-defendants are slightly different – Mr. Hughes is the only one charged with a violation of Sec. 111(a) -- the nature of their collective conduct is of a kind that warrants a similar sentence being imposed on Mr. Hughes.

Defendant Michael St. Onge – sentenced to 18 months.

Defendant Jay Johnston – sentenced to 12 months.

Defendant Kyle Kumer – sentenced to 10 months.

Defendant William Stover – sentenced to 6 months.

The Government, for reasons that are hard to discern, focuses on the case of *United States v. Denney*, 22-cr-00070 (RDM) -- also a guilty plea without the benefit of a plea agreement. But *Denny* – who was represented by the undersigned counsel – has almost nothing in common with the facts in this case.

Denny was charged with and pled guilty to a violation of Sec. 111(b). That added +2 levels to his guideline calculation. In addition, the Court found that Denney's offense conduct involved in "more than minimal planning" – another +2 level enhancement. The facts set forth in the PSR identified Denny as the founder and leader of a North Texas "militia" – the significance of which was contested by Denny – and that he organized and provided financial assistance to at least one other person in order for that person to make the trip to Washington DC as a member of the militia.

16

As for his actions on January 6, the video evidence at sentencing showed Denny's participation in four different episodes involving law enforcement – pushing and pulling on bike rack barriers on the West Plaza in opposing the efforts of the police to maintain that line; attempting to grab a OC spray device away from an Officer and then attempting dislodge the device out of the officer's hands using a length of PVC pipe; throwing a long carboard tube of unknown composition towards a group of officers; and being in the crowd of protesters at the entrance of the Lower West Terrace tunnel when USCP Officers were drug out and into that crowd where they were assaulted.  For all of that, Judge Moss sentenced Denny – and later his co-defendant Donald Hazard – to identical sentences of 58 months.

All the facts and circumstances of the *Denny* case make it inapposite to the issue of an appropriate sentence for Defendant Hughes here.

DEFENDANT'S SENTENCING RECOMMENDATION

Because Defendant Hughes' Guideline Range is in Zone B of the Sentencing Table, the Court has the discretion to impose a sentence of Probation, if a condition of probation is that a portion of the term of probation is served under conditions of community confinement.  Based thereon, Defendant Hughes suggests that a sentence of 24 months probation, with a term of probation that he serve 8 months under home confinement, is an appropriate sentence in this case.  Alternatively, if the Court determines that some term of incarceration is necessary, Defendant Hughes suggests that a term of 8 months – the bottom of the guideline range – is sufficient to address all the factors set forth in Sec. 3553(a).

Date: December 12, 2024				Respectfully Submitted,

					/s/ William L. Shipley
					William L. Shipley
					PO Box 745
					Kailua, Hawaii 96734
					Tel: (808) 228-1341
					Email: 808Shipleylaw@gmail.com

					*Attorney for Defendant*